## THE MINNIE E. KELTON.

### (District Court, D. Oregon. May 2, 1910.)

### No. 5,007.

1. SALVAGE (§ 28*)—AMOUNT OF COMPENSATION—DERELICT.
   The abandonment at sea by the master and crew of a vessel injured in a storm so that she was unmanageable, leaving her anchored a mile or two from shore in comparatively calm weather, and with the full intention on the part of the master to obtain a towing vessel and return, did not constitute her a derelict, and a salvor is not entitled to compensation on that basis.

   [Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 69, 71; Dec. Dig. § 28.*]

2. SALVAGE (§ 26*)—AMOUNT OF COMPENSATION—ELEMENTS OF AWARD.
   The elements which usually go to influence the amount of a salvage award are the value of the property salved, the value of the property employed in the service and the hazard it undergoes, the risk and peril to the salvors, the labor expended, and the promptitude, skill, and energy brought to the service.

   [Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 57–68; Dec. Dig. § 26.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

3. SALVAGE (§ 22*)—AMOUNT OF COMPENSATION—NEGLIGENT OR UNSKILLFUL PERFORMANCE OF SERVICE.

Negligence or skill in the performance of a salvage service, irrespective of resulting damages, must always influence the award, and salvage may be reduced by lack of skill and energy displayed by the salvors; and, where it results in a distinguishable injury, there may not only be a forfeiture of all right to compensation, but an affirmative award may be imposed against the salving vessel.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. § 52; Dec. Dig. § 22.*]

4. SALVAGE (§ 27*)—AMOUNT OF COMPENSATION—PERIL AT SEA.

The steam schooner Kelton, with a cargo of lumber in part on deck and in part below, started from Grays Harbor to San Francisco, and shortly after. leaving port encountered heavy weather. Two days later she was leaking badly, and her deck load was jettisoned, after which she became unmanageable and filled. She finally drifted within a mile or a mile and a half of the shore, where her anchors were dropped and held. The next day the sea was calm, and, in response to a distress signal, a life saving crew took the crew off and the master started to obtain a tug, but the Kelton was taken in tow by the steam schooner Washington, which found her deserted, and towed into the Columbia river and beached. The place where she was left was not well chosen, and a large amount was expended in getting her afloat and taking her to Portland. She should have been taken farther up the river, and, although the Washington claimed to be unable to do so, the assistance of a tug was offered her and refused. The salvage service was not attended with much danger, and the towing required 22 hours. *Held*, that the Kelton was not a derelict, and that the unskillful manner in which she was handled detracted from the value of the service; that the Washington should be awarded one-sixth of the salved value of vessel and cargo.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 65, 66; Dec. Dig. § 27.*]

5. SALVAGE (§ 1*)—NATURE.

Salvage is a reward for perilous service and skill, and not a quantum meruit for labor expended.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 1–4; Dec. Dig. § 1.*

For other definitions, see Words and Phrases, vol. 7, pp. 6312–6315; vol. 8, p. 7794.]

In Admiralty. Suit by the Washington Marine Company, owner, and H. C. Nason, master, of the steam schooner Washington against the steam schooner Minnie E. Kelton. Decree for libelants.

Snow & McCamant, for libelants.

Williams, Wood & Linthicum, for respondent.

WOLVERTON, District Judge. This is a libel to recover salvage for the rescue of the steam schooner Minnie E. Kelton by the schooner Washington.

The Kelton left Grays Harbor on her second trip to San Francisco about 10 o'clock on Thursday, the 30th day of April, 1908, with a mixed cargo of ordinary small lumber, shingles, lath, scantling, and boards, being laden about half on deck and half within the hold. The deck load was secured in the ordinary way, by chains running across from stanchions. Soon after leaving port, the schooner encountered

---

heavy weather, which increased in severity until she arrived off Yaqui-na Bay, where she shipped large quantities of water, and was found to be leaking in the bunkers. Both the bunkers and boiler were on the deck. The pumps were started, but were inadequate to keep the water down. This was on Saturday morning. Seeing that the boat was filling fast, the captain ordered the crew to start the deck load, so as to lighten her up; but, when the load went into the sea, she became unmanageable. Her course was immediately changed, with a view to working back to the Columbia. By noon she had filled with water, and was rolling heavily, when the mate was directed to hoist the life-boat out, and, while doing so, the vessel shipped a sea, and the whole cabin, two lifeboats, and eleven of the crew went overboard. But one of these men survived. At that time the vessel was about seven miles off shore, with the wind southwest, and going inshore. A raft was rigged for use in case it was seen that the vessel was nearing the rocks. As she approached nearer shore, and it was thought that soundings were within reach, the starboard anchor was let go. This did not take hold. After she had drifted yet another half hour, the port anchor was also let go, which seemed to hold her fast. These anchors were operated with chains. Later the kedge anchor, attached to a new eight-inch manila hawser, was cast over the port bow. The vessel came to a stop about 4 o'clock in the afternoon, on Saturday, the 2d of May. The master estimates the distance from shore at the time at about a mile, Mortensen, the second officer, at a mile and a quarter, and Martin, the first officer, from a mile to a mile and a half. Martin is of the opinion that the boat drifted about four miles after the first anchor was let go. He and McKenna agree that from 60 to 75 fathoms of chain was loosened with the first anchor, and about 90 fathoms with the second; but Mortensen says that from 40 to 50 fathoms only was used. The kedge anchor was thrown over for additional protection after the ship came to rest. Soundings were taken then to discover the depth of water, and it was found to be 20 fathoms. McKenna says his remembrance is that it was 24 fathoms, but he would not be positive about it. A distress signal was displayed, which brought relief from the lifesaving station, and the men were taken off, eight in number, about 5 o'clock in the afternoon of the next day, being Sunday. These three officers from their observation, and from bearings taken, and soundings, all assert that from the time the second anchor was dropped and took hold there was no appreciable change in the position of the Kelton up to the time the remaining crew were taken off and put ashore. The sea became calmer on Satur-day, and comparatively smooth on Sunday, with some swell running, and a moderate southwesterly breeze. Witnesses from the shore esti-mate that the Kelton was lying off shore from a mile and a quarter to a mile and a half, and that she did not change her position from the time she was first observed until she was taken in tow by the Washing-ton. William Matthews, who went up with one of the life saving crew from Newport, testifies that he took bearings on Sunday evening from two different places, and took careful observation of the locality of the boat, that on the following morning he used these bearings for further observation, and that, so far as he could see, the boat had not changed

her position. Mr. Chatterton, also a witness for respondent, testifies to about the same state of facts. And these are corroborated by Andrew Wiesniewski and Charles Calkins. Matthews and others of these witnesses saw the Washington take the Kelton in tow, and at the time were about three miles away. They are all firmly of the view that the Kelton had not changed her position up to that time. Further than this, three of the life saving crew testify in effect that they took close observation touching the position of the Kelton from the evening of Sunday until the next morning, when she was taken in tow by the Washington, and that they could not observe that she shifted her position in the least. The coast within the vicinity of where the Kelton was lying is rock bound, and, if she had been farther inshore, she would have been in great danger of destruction. The witnesses for libelants who speak touching the subject testify that, when the Kelton was taken in tow by the Washington, she was from four to seven or eight miles off shore, and some of them say that she was drifting at the time, while others are not positive as to that. The captain and one or two of the officers also testify that the Kelton was in the course of the Washington when she was first discovered, which would take her out at sea from five to eight miles. When the Washington approached the Kelton, it was found that the cable which was attached to the kedge anchor had worn in two, and the end was hanging over the port bow, and it seemed to be the opinion of the men who went aboard the Kelton that the chains attached to the other anchors were hanging perpendicularly, and that, if either of them was holding at all, it was very slightly. These chains were cut before attempting to move off with the schooner in tow. After making fast to the Kelton, the Washington steered for the Columbia, some 80 or 90 miles distant, and was 22 hours in making the voyage. On arriving at the Columbia the tide was nearly at flood, and the Washington started in with her tow at once. The tow struck upon the bar while passing over, and one of the cables parted. Some trouble was experienced in getting another cable to her, which consumed an hour and a half or more, and, when on the inside, the Kelton was carried opposite Smith's Point, below Astoria and just above the mouth of Young's river, and there beached. She was considerably lower by the stern than at the bow, and was drawing from 18 to 22 feet of water. For the purpose of holding her in position, an anchor was carried inshore. From this position various efforts were made to raise the Kelton, and take her thence to Portland for the dry dock. The Washington left with the Kelton two of her crew for the purpose of holding possession. The captain of the Kelton arrived in Astoria on the 7th, but he did not obtain possession of the boat. After considerable effort had been made on the part of the Washington to raise the Kelton without success, she was turned over to the underwriters, who continued the effort to get her afloat. She was first moved by tugboats out toward the main channel 400 or 500 feet. This was done on May 23d, and, after much endeavor to get her in position so that she might be towed away, she on June 14th capsized, and lost her engines and boilers. Later on, about July 26th, when they had again gotten in position so that she could be taken away, she was floated off by the tide, and lost, being carried down against

the government jetty, from which position she was towed by the Tatoosh up to Astoria, and later to Portland.

The respondent charges the Washington with bad judgment in beaching the Kelton below Astoria, alleging that she was there subjected to cross-currents induced by the wash of Young's river and the Columbia, in connection with the tides, and also to the winds and the sea, to a much larger extent than she would have been if she had been carried to the docks at Astoria, or above the docks, or yet above Tongue Point. It should be said here that while the Kelton was being towed in over the bar the Wallula stood by for an hour, and offered assistance to aid the Washington in taking the Kelton to anchorage. This assistance was refused, and yet the master of the Washington says that he was unable to carry the tow up to Astoria because of the shipping that was in the harbor. But it is without doubt that by the aid of a tugboat she could have been taken above Astoria, or above Tongue Point, or any place other than where she was deposited. There is much evidence upon the question as to whether the place where she was beached was a proper one to have taken her. Many witnesses testify that it was not a proper place, that she was there subject to greater stress of weather than she would have been above Astoria, that the tide flats were of mud, and not of the character best suited for beaching a vessel; while, on the other hand, a number of witnesses seem to be of the opinion that the place was a suitable one for beaching the vessel. The evidence of some of the witnesses who worked upon the wreck tends to show that they were not interfered with materially by reason of the wind and weather. It was manifestly a very difficult place from which to remove the vessel after she had once been beached. This is shown by the efforts made to relieve her. There has been much testimony introduced touching the value of the schooner Kelton and the damages she sustained. The estimates of value range all the way from $30,000 to $60,000. It is shown that some $12,000 or $13,000 was expended in the endeavor to get her afloat before she went off with the tide, and was taken in tow by the tug. The estimates for her repairs run $6,000, $8,000, $10,000, to $20,000. All these are matters which must be considered in determining what the Washington is entitled to for her services in recovering the Kelton from her situation above Yaquina Head. Respondent claims that the Washington is entitled to no salvage because of her bad judgment exercised in towing the Kelton to the place where she was beached. It will now be necessary to consider the legal aspects of the controversy.

It is contended on the part of libelants that the Kelton was a derelict at the time she was taken in tow by the Washington, that she was in a position of great peril, and that the services rendered in her rescue were attended with great danger and hazard, for which service the Washington is entitled to the highest compensation. If, however, it is thought that the Kelton was not a derelict in strict legal contemplation, it is yet maintained that her position was one of such peril, and the risk and danger of her rescue so great that the salvor is entitled to a very high rate of salvage. Upon the other hand, it is insisted that the Kelton was not at the time a derelict, and that the service

181 F.—16

rendered for bringing her into port was not of a hazardous or perilous character, and, furthermore, that the Washington forfeited whatever salvage she might have otherwise been entitled to through bad judgment in beaching the Kelton at an improper place, thereby necessitating very great labor and expense in raising her and sending her to dry dock. Mr. Justice Grier, in the case of The Island City, 1 Black, 121, 128, 17 L. Ed. 70, says:

"To constitute a case of derelict, the abandonment must have been final, without hope of recovery, or intention to return. If the crew have left the ship temporarily, with intention to return after obtaining assistance, it is no abandonment, nor will the libelant be entitled to the salvage as of a derelict."

The declaration of Mason, D. J., in Bean et al. v. The Grace Brown, Fed. Cas. No. 1,171, is in accord with this definition. He says:

"I regard the law as well settled that a mere abandonment of a ship on the high seas, with the bona fide intention of returning to her, when the impending peril shall have ceased, or the object of leaving her is attained, does not constitute the ship derelict."

Other discussion is had upon the subject by the learned judge, but it is not important to pursue it at the present time. The facts here put the question beyond further controversy. While it is true that no life remained upon the Kelton after the crew were taken off by the boatmen of the life saving service, Capt. McKenna had not abandoned hope of saving the vessel. Further, it would seem from the testimony that he fully intended to procure the assistance of a tug or some suitable vessel to take her to a place of safety. His own declarations on the subject are amply corroborated by witnesses Matthews, Calkins, and Wiesniewski. As soon as landed on Monday evening from the vessel, McKenna endeavored to secure passage for the night to take him to Newport, where he would be enabled to telegraph for assistance. Finding that owing to the condition of the road and tide he could not make the trip then, he availed himself of the earliest opportunity, which was early the next morning. And it was while he was on his way to Newport, with the purpose of summoning assistance, that the Washington took the Kelton in tow. Capt. McKenna, having observed the Washington steam away with his vessel, could do nothing further in the way of saving her himself. From his testimony and that of his officers it would seem that the Kelton was lying safely at anchor in a comparatively smooth sea, with a light breeze from the southwest, and that he had good reason to believe that, without further stress of weather, he could readily summon assistance from the Columbia, which would come in good time to save his ship either from destruction upon the rocks inshore or from being carried to sea and lost. He had taken down his distress signal, and had left no note or notice aboard the ship of his intentions regarding her. This may perhaps be taken as evidence of an abandonment, but this is adequately overcome by his declarations and acts clearly showing his purpose to rescue his vessel from her present peril. It may be reasonably predicated of the situation that the Washington was justified in taking the Kelton in tow with a view of salving her. This leads to a further inquiry touching the perils to which the Kelton was subjected, and the hazard and risk attending her recovery. The witnesses are fairly well

agreed as to the state of the weather and the sea at the time the Kelton was sighted and picked up by the Washington. There was a moderate southwesterly breeze, and the sea was undisturbed except by the ordinary swells. The stress of weather which rendered the Kelton helpless had abated, and the difficulties from that source of taking the Kelton in tow were not extraordinary or unusually hazardous.

Now, something as to her position with relation to the shore. The coast, as has been shown, along in that vicinity, is rocky and dangerous to shipping. The Kelton, however, was without question beyond danger from that source. That is, she was lying outside of the rocks and ledges that would render her position exceedingly perilous if farther inshore. That she was beyond the rocks and ledges and the dangers incident thereto is proven by the fact that, when the Washington came up, after signaling to ascertain if any person was aboard the Kelton, she circled around the Kelton at a safe distance once or twice before sending men to board her. This would not have been possible if the Kelton had been close inshore. The more serious question is whether the Kelton was drifting, and in peril of being carried beyond the discovery of craft that might have been sent to her relief. Upon this question the witnesses disagree widely. Libelants' witnesses uniformly assert that the Kelton was from four to five and eight miles off shore, and that persons and even houses and buildings on shore were indistinguishable with the naked eye, and nearly all of them say she was adrift; that is, not being held steadily by her anchors. Two of them were not so positive, but supposed her to be drifting. Respondent's proofs on the other side are as uniformly to the effect that she was not drifting, and was not more than from a mile to a mile and a half from shore. From a careful survey of the testimony, I am disposed to give the larger credence to the respondent's witnesses. Some of them took careful bearings, and from these careful observations from time to time to ascertain whether any change of position was taking place, and they could discover none. These were corroborated by others, who took casual observations and believed the vessel to remain stationary, as well as by the captain, officers, and crew from the Kelton, who were firmly of the belief that her anchors were holding her fast. It is perhaps difficult for one ashore or at sea, for that matter, to determine the exact distance of an object upon water. But it seems practicable and reasonable that the distance of this boat from shore should be approximated within a mile or so. If the Kelton had been eight miles from shore, no one could be so mistaken as to say she was within a mile or a mile and a half; and so, with scarcely less probability, if she was four miles from shore. It is difficult to account for such a discrepancy, unless by the interest libelants' witnesses have in the outcome of the litigation. Whatever may have influenced their testimony, however, I fully believe them to be in error. I am of the opinion that the Kelton was holding fast by her anchors, and that her position was approximately a mile to a mile and a half from shore. The difficulty and perils of getting hawsers to her for carrying her away were therefore not beyond the usual difficulties of picking up a boat helpless for navigation at the ordinary and prevailing condition of the sea

and weather. The voyage to the Columbia was unaccompanied with incident or hazard. It was made in about 22 hours. The Washington was carrying about one-third of her cargo capacity, and she pursued the route in which she was destined for the delivery of her cargo.

The more difficult phase of the controversy relates to the manner in which the Kelton was carried over the bar at the mouth of the Columbia, and the disposition made of her when within the river. While passing in, the Kelton bumped upon the bar, and parted one of her towlines, causing considerable delay before she was again secured. What damage, if any, the Kelton sustained by the incident, is problematical. The disposition made of her by beaching her on the sands above the junction of Young's river with the Columbia was evidently not prompted by the better judgment. A more appropriate disposition of her would have been to have taken her alongside the docks at Astoria, or to have beached her just below or above Tongue Point. It was feasible to have taken her to either of these places; perhaps not with the power and equipment of the Washington alone, but it could have been safely done with the aid of the Wallula, which stood ready, while the Kelton was delayed on the bar, to render such service as was requested or necessary. The captain of the Washington and her other officers assert that they were without knowledge as to the best place to bring the Kelton to anchor, and therefore they chose the place below Astoria. These officers were in a position to have obtained the advice of the pilot of the Wallula, which would have directed them to the docks at Astoria, or above the city, not below. The great difficulty experienced in extricating the Kelton from the position in which she was placed is strong evidence that it was not the most appropriate place under all the circumstances to beach her. I will not attempt, therefore, to discuss in detail the evidence touching the particular inquiry.

Naturally enough, a salvor's compensation depends upon the degree of forethought, skill, and discernment with which a vessel is brought to a place of safety, as well as upon the perils and hazards undergone in rescuing her from her first position. If he renders a high service, so that the very least injury will ensue from her rescue, it is but reasonable that the award should be graded accordingly. If, however, the service is of an indifferent order, the salvor looking rather to his award than to as complete a restoration of the property as is reasonably possible, he will deserve, and, of course, will be entitled to, much less compensation. The allowance of salvage is based upon two considerations—one, of public policy, which suggests a liberal bounty to induce vessels and water craft to turn aside from their regular course and endure the hardships and perils of removing dangerous wrecks from the pathway of commerce, and the other, to restore the wreck or disabled vessel to the owner, and the service which is adequately commensurate with the successful performance of the undertaking is accounted of high merit, and the award therefor is measured accordingly. The elements which usually go to influence the amount of the award are the value of the property salved, the value of the property employed in the service

and the hazard it undergoes, the risk and peril to the salvors, the labor expended, and the promptitude, skill, and energy brought to the service. The Blackwall, 10 Wall. 1, 19 L. Ed. 870; The Shawmut (D. C.) 155 Fed. 476. "The rule of diligence obligatory on salvors," says the court, in Serviss v. Ferguson, 84 Fed. 202, 28 C. C. A. 327, "is that of ordinary care, such as persons of reasonable prudence would naturally be expected to exercise for the preservation of their own property from loss or injury under like circumstances." This rule is as well applicable where a vessel is taken in tow and is being carried to a place of safety. Negligence or skill, however, irrespective of resulting damages, must always influence the award, and salvage may be reduced by lack of skill and energy displayed by the salvors, and even forfeited by their misconduct or gross negligence. The Katie Collins (D. C.) 21 Fed. 409; The Henry Steers, Jr. (D. C.) 110 Fed. 578; The Bremen (D. C.) 111 Fed. 228. And, where a distinguishable injury has resulted from the negligence of one undertaking a salvage service, there may not only be a forfeiture of all right to compensation, but an affirmative award may be imposed against the salving vessel. The S. C. Schenk, 158 Fed. 54, 85 C. C. A. 384.

Capt. Nason did not think his boat, with the arrangement of its equipment, could safely tow the Kelton past the shipping lying at Astoria so as to get her above, leaving the inference that but for the shipping he would have taken her up there. He had at his call, however, the tug Wallula, which could have readily and safely done the service, and I think he should have availed himself both of the advice of the pilot on the tug and of the service of the tug in getting his tow to a place of greater safety and of superior advantages for putting her in suitable condition to take her to the dry dock. I do not consider that Capt. Nason is guilty of negligence so gross as to entail an affirmative judgment against his vessel nor to forfeit his entire award for salvage; but I do think his conduct is censurable to the extent of lessening his award. Undoubtedly the expense of getting the Kelton to dry dock was very largely increased by reason of her being beached as the Washington left her. Salvage being not a quantum meruit for labor expended, but a reward for perilous service and skill, and promptitude in its rendering, it is very apparent that the salvors here are not entitled to an award which would attend the highest service. The services were yet of some merit in salving the property, and compensation should be allowed above a mere quantum meruit. The rule seems fairly well established by which the salvor of a derelict will be allowed compensation equal in value to one-third to one-half of the value of the property salved. In other cases the amount of the reward is very largely within the discretion of the court; all the circumstances involved by the controversy being considered. Various estimates have been made of the value of the Kelton. The one I am disposed to adopt is that made by Capt. McKenna, which is $45,000 when she left out of Grays Harbor. She sustained large damage at sea. To repair that damage, together with such as she sustained on the beach, would approximate $20,000. This is the testimony of Capt. Gener-

eaux, who is a competent marine surveyor, and has had very large experience in raising vessels. He testifies further that from $12,000 to $13,000 was expended in his attempt to extricate the Kelton from her position on the beach at Smith's Point. There was aboard the Kelton about 300,000 feet of lumber, worth probably $12 per thousand. The combined cost of raising the vessel, taking the lesser estimate, and of her repair, should be deducted from her sound value, and I allow for the salvage services of the Washington one-sixth of the balance, or $2,766.66, with legal interest from May 5, 1908.

Such will be the decree of the court.