**BASIC BOATS, INC., for the Use and Benefit of Lumbermens Mutual Casualty Company, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. C. 364–69–N.**

United States District Court,
E. D. Virginia,
Norfolk Division.

Dec. 11, 1972.

Peter W. Rowe, Norfolk, Va., for plaintiff.

Brian P. Gettings, U. S. Atty., Norfolk, Va., Admiralty & Shipping Section, U. S. Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM

WALTER E. HOFFMAN, Chief Judge.

This action was commenced by Basic Boats, Inc., suing by its insurance carrier, for damages allegedly caused to the sailing yacht CONJUR MAN. The United States is a proper party defendant having consented to be sued by virtue of the Suits in Admiralty Act, 46 U.S.C.A., §§ 741–752, and the Public Vessels Act, 46 U.S.C.A., §§ 781–790. The defendant asserts a claim for salvage by way of recoupment, the propriety of which was previously decided by this court. See Basic Boats, Inc. v. United States, 311 F.Supp. 596 (E.D. Va., 1970).

The CONJUR MAN is a 34-foot, steel-hulled ketch designed for coastal and ocean cruising and was on a return voyage from Bermuda to Annapolis, Maryland, during the month of July 1967. Leonard C. Rennie was master of the yacht and was aided by Leonard B. Tennyson and his young son as crewmen. During this return voyage, the CONJUR MAN lost its mainmast and, shortly thereafter, its mizzenmast. Rennie made a concerted effort to attract assistance since the gasoline auxiliary engine was also inoperable. Contact was finally made with a Navy helicopter and Rennie requested the pilot to inform the Coast Guard of the position and condition.

The helicopter notified a Navy convoy which was conducting exercises nearby, and the destroyer WALLACE L. LIND arrived sometime later. While approaching the yacht, the captain of the LIND prepared to provide fuel, food, technical, and medical assistance as the exact nature of distress was unknown to him. The destroyer approached the yacht upwind, and stopped dead in the water some four to five hundred yards away. Since the destroyer had a greater sail area, it drifted down on the yacht at a relative speed of one knot. Voice contact was attempted but, due to the 15 to 25 knot wind, such communication was impracticable until the vessels were extremely close. As the vessels neared contact, fenders were put out by the destroyer and an attempt was made to throw a heaving line to the CONJUR MAN, which attempt failed because of the movement of the yacht in the five to eight-foot seas.

The LIND continued to close on the CONJUR MAN until finally, at a distance of 200 yards, Rennie confirmed the fact that he required assistance but still failed to state exactly what was and what was not desired. The decision was made to make contact with the yacht amidships on the lee side since boarding the yacht might be necessary and, if merely a tow was required, it would be necessary to obtain authorization to do so since the destroyer had been ordered only to find out what assistance was required. Ten men were deployed to make ready for contact—six for handling lines and four to handle fenders. Contact was finally made with the vessels in a port-to-port relation.

A one-inch nylon line was passed up from the CONJUR MAN to the LIND which kept the yacht stationary relative to the destroyer. Lines from the destroyer were not used at this point because they were located in another part of the ship and the time sequence and temporary nature of the proceedings at that stage did not justify producing them. The yacht had other lines below, its own fenders and a boat hook, none of which was made ready by the three members on board since they were awaiting instructions. Shortly after the line from the CONJUR MAN was attached to the destroyer, a large ground swell swept down the side of the LIND causing the yacht to rise fairly high relative to the destroyer and then drop suddenly. This sudden strain on the line caused it to part and the CONJUR MAN began to move aft. A boat hook was given to Rennie with which to fend off, but the two crew members decided to abandon ship. The Navy personnel then became concerned primarily with the safety of the individuals.

The CONJUR MAN struck the screw guard, damaging the cabin structure. It then floated off and, by means of a lyle gun, a heaving line was passed to the yacht, eventually getting a tow line to it and having it attached. Rennie then got off the yacht and a crew from the destroyer went aboard for the night. The next day the yacht was turned over to a Coast Guard cutter which completed the tow to Norfolk.

Throughout the transcript references are made to the singular request on the part of Rennie for a tow. Before deciding the applicable standard of care, it must be determined whether these facts amount to a contract for towage or a salvage situation. Although the only assistance requested was a tow to Norfolk, the totality of the circumstances compels a finding of an operation in the nature of a salvage. The distinction between the two has been clearly drawn. Towage is undertaken for the sole purpose of expediting the voyage. Salvage is a service rendered to a vessel which removes it from some distress. McConnochie v. Kerr, 9 Fed. 50 (S.D.N.Y., 1881). Without either mast or the use of its auxiliary motor, the CONJUR MAN was in a position of anticipating some danger. Though it was not in eminent danger, the actions of the LIND were in the nature of a salvage operation as immediacy of harm is not essential to salvage.

48

■ The next question is the appropriate standard of care with respect to a Navy ship acting as a salvor. The United States would never be liable but for the waiver of its sovereign immunity, so the statutes creating liability would also indicate the standard of care imposed. Suits in Admiralty Act, 46 U.S.C.A., §§ 741–752; Public Vessels Act, 46 U.S.C.A., §§ 781–790. The Supreme Court has interpreted these statutes together to impose liability upon the government where the principles of admiralty law would impose liability on private individuals. Canadian Aviator, Ltd. v. United States, 324 U.S. 215, 65 S.Ct. 639, 89 L.Ed. 901 (1945). It has been argued that at least the Coast Guard should be held to a higher standard in salvage cases, since one of its functions is to aid distressed vessels, 14 U.S.C.A., §§ 2 and 88(b). However, even in light of this "duty," the liability of the Coast Guard rises no higher than that of private parties. Frank v. United States, 250 F.2d 178 (3 Cir., 1957), cert. denied 356 U.S. 962, 78 S.Ct. 1000, 2 L.Ed.2d 1069 (1958). A fortiori, the Navy cannot be held to any higher standard.[1] While one case has indicated that, for policy reasons, the United States should not be liable for its Coast Guard at sea, P. Dougherty Co. v. United States, 207 F.2d 626 (3 Cir., 1953), this court is of the opinion that the rule announced in Canadian Aviator, Ltd., supra, is controlling in a salvage situation.

■ For these reasons, the standard imposed on private individuals will be applicable to this case. The rule generally seems to be that a salvor must act in good faith and exercise reasonable skill and prudent seamanship. The Laura, 14 Wall. (81 U.S.) 336, 20 L.Ed. 813 (1871). A salvor whose conduct falls below this standard must be held accountable "as does negligence in the performance of any other assumed or imposed duty." The Cape Race, 18 F.2d 79, 81 (2 Cir., 1927). The difficul-

ty arises as to the manner in which a negligent salvor will be held accountable.

■ The consequences of a negligent salvage will vary depending on the type damage caused thereby. If the misconduct prevents a successful salvage, generally there will be no affirmative damages awarded against the salvor unless there is a finding of gross negligence or willful misconduct. The S. C. Schenk, 158 F. 54 (6 Cir., 1907), Chesapeake Bay Bridge & Tunnel Dist. v. Oil Screw Prince, 298 F.Supp. 881 (E.D.Va., 1968). Conversely, there will be no award made to the voluntary salvor, since the operation was unsuccessful. The Blackwall, 10 Wall. (77 U.S.) 1, 19 L.Ed. 870 (1869).

■ The more difficult situation is when the distressed vessel is removed from its peril, but in the process suffers some distinguishable injury—that is, a type of damage other than that which could have been suffered had not salvage efforts been undertaken. The Noah's Ark v. Bentley & Felton Corp., 292 F.2d 437 (5 Cir., 1961). The cases seem to hold the salvor liable for ordinary negligence. See The Noah's Ark, supra; The Cape Race, supra; The Jean L. Somerville, 286 F. 35 (5 Cir., 1923). While this seems harsh, it should be remembered that an award for salvage is much larger than if based on quantum meruit, thus a salvor is being paid to exercise care over the property in his control.

■ Some authorities draw a distinction between conduct undertaken while both ships are subjected to the peril, and conduct during the disposition of the salved vessel after removal from peril. In the former instance, courts should be reluctant to find negligence. The Henry Steers, Jr., 110 F. 578 (E.D. N.Y., 1901). This is not to say that, in the proper case, the salvor should not be held accountable in damages for negligence in the act of salvage. The Cape Race, supra.

---

1. See also exclusion of warships from provisions of salvage treaty adopted in 1910.

46 U.S.C.A., § 731. Cf. Norris, The Law of Salvage § 79.

The rule seems to be that for a distinguishable injury, if there is negligent conduct which is the proximate cause thereof, the salvor shall be held accountable. It likewise seems to be the rule that the salvor's recovery may not only be diminished, *The Jean L. Somerville, supra,* it may be forfeited entirely, or in the proper case he may be liable by way of affirmative damages. *The Noah's Ark, supra; The Cape Race, supra.* An award of damages to the salved vessel seems to be contingent upon the degree of culpability and lack of care shown by the salvor. The Minnie E. Kelton, 181 F. 237 (D.Ore.1910).

The CONJUR MAN suffered a distinguishable injury, since a crushed cabin was not a peril it faced absent a salvage attempt. The LIND would be accountable for any negligent conduct which was the proximate cause of the injury sustained. The negligence will have to be a matter of proof, as the mere fact of an accident creates no presumption of negligence. The plaintiff bears the burden to prove misfeasance. The Daniel Kern, 27 F.2d 920 (W.D. Wash.1928).

Under the circumstances as revealed at trial, this court must find that the actions of the WALLACE L. LIND did not fall below the standard of ordinary care. It is claimed that the destroyer should not have made contact with the CONJUR MAN amidship on the lee side. Evidence revealed this to be a normal procedure with respect to boats to be taken aboard, and also for an eventual tow if the smaller craft had any power. The crew on the LIND attempted to ascertain exactly what assistance was required, but to no avail. In light of the fact that medical or technical personnel might need to board the CONJUR MAN, or that the crew members might need to abandon the yacht, or that lengthy repairs might be required, taking the yacht in its lee was proper.

Another complaint concerns the lack of the proper lines to secure the CONJUR MAN to the side of the LIND. The law imposes no duty on the Navy to have any salvage equipment on deck. United States v. Sandra & Dennis Fishing Corp., 372 F.2d 189 (1 Cir., 1967); Foltting v. Kaevando, 324 F.Supp. 585 (S.D.Tex., 1971). The facts disclose heavy towing lines on the fantail of the destroyer, but the time sequence did not allow for their being brought forward. It is also important to note that there were sufficient lines aboard the CONJUR MAN, none of which were produced by the crew. The line which was used came from the yacht and its particular strength was within the knowledge of Rennie. This same type line is used by the destroyer crew to make their twenty-six foot whaleboats fast to the side.

Once the line parted, fault is contended with the Navy personnel for not taking action to prevent the collision with the screw guard. The destroyer did pass a boat hook to Rennie with which he unsuccessfully attempted to fend the yacht off. The crew did move the fenders down toward the stern to keep the two ships from rubbing. The fact that it was at this point that two crew members decided to abandon the CONJUR MAN also influences the finding of no negligence.

Even assuming the LIND was negligent under the circumstances confronting it, this would not be a proper case to allow affirmative damages. The negligence of the LIND is slight, if at all, and the CONJUR MAN is not wholly without fault. Both Rennie, who had sailed single-handedly to Bermuda, and Tennyson, who had four years' experience in the Coast Guard, were seasoned seamen, but neither did anything to improve the position of the CONJUR MAN or to aid in its salvage. Useful equipment aboard the CONJUR MAN was not utilized; no suggestions were made; and most significantly no information was imported as to the nature of the required assistance until after contact had been made.

For the reasons stated above, the relief sought by the plaintiff is denied. Since the issue involving recoupment is now moot, counsel may present a final judgment order.