KENTWOOD LIMITED, Plaintiff,

v.

UNITED STATES of America, William R. Watson, III, Sea Legs, Inc. d/b/a Sea Tow Services—Hampton Roads, and Sea Tow Services International, Inc, in personam, Defendants.

Civil Action No. 2:96cv58.

United States District Court,
E.D. Virginia,
Norfolk Division.

June 19, 1996.

Christopher Alan Abel, Guilford D. Ware, and David Harlen Sump, Crenshaw, Ware & Martin, Norfolk, VA, for plaintiff.

Anita Kay Henry, United States Attorney's Office, Norfolk, VA and Richard T. Buckingham, U.S. Department of Justice, Trial Attorney, Admiralty, Washington, DC, for the U.S.

John Early Holloway, Hunton & Williams, Norfolk, VA, for William R. Watson, III and Sea Legs, Inc. dba Sea Tow Services Hampton Roads.

Richard Campbell Langhorne, Roussos and Langhorne, Norfolk, VA, for Sea Tow Services International, Inc.

### MEMORANDUM AND ORDER

CLARKE, District Judge.

This is a maritime case in which Plaintiff seeks recovery from Defendants for damages amounting to the total loss of the JADE CAT, a fifty-eight foot catamaran sailing vessel. Defendants are alleged to have caused this damage and total loss during the failed attempt to salvage that vessel following its grounding on October 10, 1994. At issue before the Court are Defendants Watson and Sea Tow Services—Hampton Roads' (collectively "Defendants," individually "Watson" and "Sea Tow—Hampton Roads") Motion to Dismiss and Motion for Summary Judgment. A hearing on this matter was held on June 4, 1996. Following that hearing, the Court made its ruling from the bench, denying Defendants' Motion for Summary Judgment and deferring decision on the Motion to Dismiss pending further review of the novel issues raised in this case. A Motion to Dismiss filed by the United States has previously been denied.

Defendants' summary judgment motion was directed at Plaintiff's gross negligence claim. As previously stated, that motion was **DENIED** from the bench. The Motion to Dismiss targets Plaintiff's two contract claims and one negligence claim under salvage law. For the reasons set forth below, the Court **DENIES** Defendant Sea Tow—Hampton Roads' Motion to Dismiss the two contract claims. The Court **GRANTS** Defendant Watson's Motion to Dismiss the contract claims against him in his personal capacity. The Court **DENIES** Defendants' motion as to the salvage law negligence claim despite the fact that Plaintiff has failed to allege a distinguishable injury caused by Defendants' negligence.

### I. BACKGROUND

The facts in this case are taken from Plaintiff's allegations for the purposes of this Motion to Dismiss. On October 10, 1994, the S/V JADE CAT ran aground in the vicinity of the Lynnhaven Inlet in the lower Chesapeake Bay. The JADE CAT is owned by Plaintiff and was under the command of Captain Jacques De Meester. De Meester, a Belgian citizen, was unfamiliar with the lower Chesapeake Bay. The stranding left the JADE CAT unable to maneuver but otherwise in no imminent danger of sinking. De Meester contacted the United States Coast Guard and requested assistance including the furnishing of a pump. The Coast Guard contacted Defendant Watson. Watson is the owner of Defendant Sea Tow—Hampton Roads, a professional marine towing and salvage company, and is an agent for Defendant Sea Tow Services International. Watson, utilizing Sea Tow—Hampton Roads' motor vessel BAY RETRIEVER, went to the scene of the stranding to assist the JADE CAT.

The BAY RETRIEVER did not bring a pump to the JADE CAT on its first visit. Soon after the BAY RETRIEVER's arrival on the scene, it became apparent that the BAY RETRIEVER was underpowered to perform the functions necessary to refloat the JADE CAT. Watson took De Meester and the one other crewmember off the JADE CAT and brought them ashore. Watson and De Meester agreed to meet the next day to discuss salvage efforts. The following day, October 11, Watson and De Meester met. Watson represented that he, through Sea

Tow—Hampton Roads, was an experienced and qualified marine salvor and offered to perform the salvage services. Sea Tow—Hampton Roads and De Meester entered into a "No Cure—No Pay" agreement under which Sea Tow—Hampton Roads was to "render assistance" and "endeavor to save" the JADE CAT. Sea Tow—Hampton Roads was given possession and control of the JADE CAT and was to be compensated only in the event that the JADE CAT was salvaged.

Watson and Sea Tow—Hampton Roads began salvage attempts on October 11. Plaintiff alleges that Sea Tow—Hampton Roads was ill-equipped and too inexperienced to salvage the JADE CAT and that Sea Tow—Hampton Roads did not provide a professional effort in terms of time spent or equipment utilized in the attempted salvage. By midday on October 12, Sea Tow—Hampton Roads realized that it would have to call in assistance to salvage the JADE CAT. Arrangements were made for a tug and barge to be called to the scene of the grounding. Before this help could arrive, however, a powerful storm hit the lower Chesapeake Bay and the tug and barge were unable to begin salvage efforts. On October 17, 1994, after prolonged exposure to the storm while aground, the JADE CAT became a total loss. Plaintiff now seeks damages in the amount of $1,800,000 for the loss of the JADE CAT.

## II. ANALYSIS

### a. Standard of Review

In ruling on a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, the complaint is construed in the light most favorable to the plaintiff with its allegations taken as true. *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). The complaint should not be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts that would entitle it to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Bruce v. Riddle,* 631 F.2d 272, 273–74 (4th Cir.1980). A court should not dismiss a complaint even if the chance of recovery on the basis of the

pleadings appears remote. *Scheuer,* 416 U.S. at 236, 94 S.Ct. at 1686.

### b. Plaintiff's Claims

Plaintiff raises four (4) causes of action against Defendants Watson and Sea Tow—Hampton Roads. Two of the claims sound in general maritime salvage law, alleging that Defendants were negligent and grossly negligent in the performance of the salvage operations. The two other claims are brought under the "No Cure—No Pay" agreement, namely causes of action for breach of contract and breach of warranty for failure to salvage in a workmanlike manner.

### c. Contract Law Causes of Action

This case requires the Court to decide a novel issue of law relating to the interaction of contract and salvage law. The existing case law deals with whether a salvor's compensation is governed by the provisions of an agreement between the master of the distressed vessel and the salvor or by the more generous provisions of the general salvage law. In such situations, the Supreme Court has instructed that "nothing short of a contract to pay a given sum for the services to be rendered, or a binding engagement to pay at all events, whether successful or unsuccessful in the enterprise, will operate as a bar to a meritorious claim for salvage." *The Camanche,* 75 U.S. (8 Wall) 448, 477, 19 L.Ed. 397 (1869). The Court noted that agreements that do not meet the exacting specificity of sum certain payments or non-contingent recovery do not "alter the character of the services rendered, so that if it was in fact a salvage service, it is none the less so because the compensation to be received is regulated by the terms of an agreement between the master of the ship or the owners of the salved property." *Id.*

The law as set out in *The Camanche,* as it relates to salvage awards, continues to be the law today. 3A Martin J. Norris, BENEDICT ON ADMIRALTY (The Law of Salvage) § 160 (6th ed. 1993 & 1996 Supp.) (hereinafter "BENEDICT") (quoting *The Camanche* regarding the creation of enforceable salvage contracts). BENEDICT goes on to state:

Thus, a more exacting standard is required to prove a valid and binding contract with respect to salvage agreements, than of ordinary business contracts relating to matters ashore. The salvage contract need not be in writing but the terms must be clear, definite and explicit as to the amount and that there is mutual understanding that the services involved are in the nature of salvage. A contract will not be inferred by implication in the absence of the aforementioned factors.

*Id.* The existence of a specific and definite salvage contract creates a binding duty on the salvor that obviates the voluntariness necessary to establish a "pure salvage"[1] situation. *Flagship Marine Servs. v. Belcher Towing Co.*, 966 F.2d 602, 604–05 (11th Cir. 1992) (noting the need of a "special contract" to serve as a marine salvage contract); BENEDICT at § 81 ("Although salvage work is [a professional salvor's] business, the professional salvage company is nevertheless a volunteer when responding to a call for aid"). The mere request for salvage services and their provision by a salvor does not create a salvage contract. *Flagship Marine Servs.*, 966 F.2d at 605.

■ The case before this Court is substantially different from the scenarios contemplated in *The Camanche, Flagship Marine Services,* and BENEDICT. *The Camanche* and the other authorities address situations where courts must decide what legal framework governs a salvor's compensation. The situation at bar is different in that Plaintiff seeks affirmative damages from the salvor unrelated to the salvor's compensation. Indeed, in this case, as there was no salvage to speak of, the "salvor" has no claim to make. The parties have not provided and the Court has not found precedent that directly addresses this issue. Upon careful consideration of the "No Cure—No Pay" agreement's provisions, the Court believes that the holding in *The Camanche* does not govern its decision in this matter.

■ The distinction between "pure salvage" and contract salvage addressed in *The Camanche* revolves entirely around the standards to be applied in compensating salvors. BENEDICT at § 159. "Pure salvage" is defined as a "voluntary service rendered to imperiled property on navigable waters where compensation is dependent upon success, without prior agreement or arrangement having been made regarding the salvor's *compensation.*" *Id.* (emphasis added). The "No Cure—No Pay" agreement in this case established that general salvage law was to apply regarding compensation in the event that the JADE CAT was salvaged. To that end, the agreement sets no specific amount of recovery and states that "[n]o agreement on price or its reasonableness has been made at the scene unless agreed to in writing." The "No Cure—No Pay" part of the agreement was a signal that compensation would be in the form of a salvage award—that is, compensation "not regarded merely as pay on the principle of *quantum meruit,* ..., but as a reward to persons participating and the owners of salving property, voluntarily rendering their services." BENEDICT at § 3.

■ The agreement at issue in this case went beyond the "no cure—no pay" provision. The agreement contained a bargained for exchange that constituted a contract. A contract is "a promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty." RESTATEMENT, SECOND, CONTRACTS § 1. Plaintiff, through its agent Captain De Meester, gave possession and control of the JADE CAT to Defendants in exchange for their salvage efforts. Defendants' efforts included "render[ing] assistance" and "endeavor[ing] to save" the JADE CAT. This bargained for exchange was supported by adequate consideration under Virginia law and formed a binding contract. *See Sea–Land Service, Inc. v. O'Neal,* 224 Va. 343, 350, 297 S.E.2d 647 (1982). Even if Defendants were to argue that the agreement only constituted a

---

1. For a marine rescuer to recover a salvage award, that is, to be in a "pure salvage" situation, the rescuer must set out three elements: (1) a marine peril, (2) service voluntarily rendered and not required by a duty or contract, and (3) success in whole or in part or service contributing to eventual success. *Flagship Marine Servs.,* 966 F.2d at 604–05.

"promise" to salvage, it is alleged that that promise induced reliance on the part of Plaintiff in that Captain De Meester stopped his search for a salvor upon receipt of Defendants' promise. Such reliance constitutes a bargained for detriment on the part of Plaintiff so to form a contract. *See Kiser v. Amalgamated Clothing Workers of America,* 169 Va. 574, 194 S.E. 727, 730 (1938).

Defendants argue that Plaintiff may not use contract law to impose liability where the general law of salvage would not. The Court does not agree with this argument. In recognizing that a contract was formed giving Defendants a virtual monopoly over the salvage rights to the JADE CAT in exchange for the right to a liberal salvage award in the event of success, the Court is obligated to recognize the rights and obligations created by that contract. The attempted salvage of the JADE CAT, while in part comprising a voluntary salvage effort, also entailed a commercial agreement that created a business relationship between the parties. That relationship was formalized through a contract. The attempted salvage of the JADE CAT was not a marine rescue situation. Defendants removed Captain De Meester from the JADE CAT at close to midnight on October 10. Defendants and De Meester waited some twelve hours to formalize the salvage agreement. While the agreement left the compensation term to be determined under general salvage law, the agreement formalized the exchange of control of the JADE CAT for the right to a potential salvage award.

■ Plaintiff has raised two causes of action under the contract. First, Plaintiff argues that Defendants breached the contract by not "rendering assistance" or "endeavoring to save" as was contemplated by the contract and in keeping with the business standards of professional salvors. Second, Plaintiff contends that Defendants breached a warranty of workmanlike performance. This warranty must be implicit in the contract, as there is no explicit provision to that

effect. The Court finds that Plaintiff's two contract claims are indistinguishable in that they raise the same allegations and require the same assessment of Defendants' performance under the contract. The Court also notes that Defendant Watson, in his personal capacity, is not a party to the contract. Further, Watson, as a disclosed agent of Sea Tow—Hampton Roads, is not subject to personal liability for having signed the contract on behalf of his principal. *Port Ship Service v. International Ship Mgmt.,* 800 F.2d 1418, 1421 (5th Cir.1986) (per curiam). Plaintiff has made no allegation that Sea Tow—Hampton Roads is a sham corporation warranting "piercing the corporate veil" in this case. Therefore, Watson's Motion to Dismiss the contract claim against him in his individual capacity is **GRANTED.** However, having recognized the existence of a contract in the provisions of the "No Cure—No Pay" agreement, Defendant Sea Tow—Hampton Roads' Motion to Dismiss the aggregated contract claim is **DENIED.**

#### d. *Salvor Misconduct under Salvage Law*

■ "Generally every salvor is bound to the exercise of ordinary skill and diligence." *The Cape Race, The Thetis, The Woodmancey,* 18 F.2d 79, 81 (2d Cir.1927); *see Basic Boats, Inc. v. United States,* 352 F.Supp. 44, 48 (E.D.Va.1972); BENEDICT at § 120. Misconduct on the part of a salvor does not necessarily lead to liability though. *See The Cape Race,* 18 F.2d at 81 ("negligence in a would-be salvor is perhaps viewed with a benevolent eye"). Generally, a salvor is liable for an unsuccessful salvage only when there is a finding of gross negligence or wilful misconduct.[2] *The Noah's Ark v. Bentley & Felton Corp.,* 292 F.2d 437, 441 (5th Cir.1961); *The Cape Race,* 18 F.2d at 81; *Basic Boats, Inc.,* 352 F.Supp. at 48; *Chesapeake Bay Bridge & Tunnel Dist. v. United States,* 298 F.Supp. 881, 885 (E.D.Va.1968).

■ Under salvage law, a salvor may be liable for simple negligence only when its

**2.** Plaintiff's have alleged gross negligence on the part of Defendants. From the bench, this Court denied Defendants' Motion for Summary Judgment on the gross negligence claim, citing the evidence that might be used to prove wrongdoing on the part of Defendants. This evidence raised questions of material fact regarding Defendants' gross negligence in the salvage of the JADE CAT.

misconduct causes a distinguishable injury to the salvaged vessel. *The Noah's Ark*, 292 F.2d at 441; *The Cape Race*, 18 F.2d at 81; *Basic Boats, Inc.*, 352 F.Supp. at 48; BENE-DICT at § 120. A distinguishable injury is "some type of damage sustained by the salved vessel other than that which she would have suffered had not salvage efforts been undertaken to extricate her from the perils to which she was exposed." *The Noah's Ark*, 292 F.2d at 441. The distinguishable injury requirement serves to protect salvors from liability based on simple negligence for a mere failure to salvage a vessel.

 In this case, Plaintiff has not raised allegations of a distinguishable injury. Taking Plaintiff's allegations as true, the JADE CAT was destroyed on October 17, 1994 by the same peril to which she was subjected on October 10, 1994—being stranded on a shoal and subject to the vicissitudes of weather. If Defendants had never offered assistance, the JADE CAT would have met her fate in the storm in any event. Accordingly, a distinguishable injury cannot be attributed to Defendants, and Plaintiff has no cause of action under that theory.

### e. Professional Salvor Misconduct

 Notwithstanding the distinguishable injury analysis, the Court believes that salvage law imposes heightened duties on professional salvors that may make them liable for negligence even in the absence of a distinguishable injury. A salvor is under a duty to use "ordinary skill and diligence in the pursuit of [a] salvage undertaking." BENEDICT at § 122. All salvors, including professional salvors, are under an obligation to promote the best use of personnel and resources in salvaging a vessel. *Id.* This obligation includes deferring to more capable salvors when the situation warrants. As stated in BENEDICT:

> [O]ne who undertakes the role of salvor when skilled or more capable help is in attendance will be penalized when damage to the salved property occurs because of his blunders by a diminished award or a

forfeiture of the award or by a mulct in damages.

*Id.* (citing *The Cape Race*, 18 F.2d at 79).

 Professional salvors are afforded a privileged position under salvage law. "Professional salvors, who at considerable effort and expense hold themselves in readiness to assist lives and property in peril at sea, necessarily incurring thereby indefinite periods of inactivity, have long been regarded by the American courts as appropriate recipients of liberal salvage awards." *B.V. Bureau Wijsmuller v. United States*, 487 F.Supp. 156, 172 (S.D.N.Y.1978), *aff'd*, 702 F.2d 333 (2d Cir.1983). The policy of generous salvage awards for professional salvors helps to promote and perpetuate an effective professional salvor industry. BENEDICT at § 81. As stated by the Second Circuit almost one hundred years ago:

> The skill that comes from long experience, joined with more powerful machinery, and devices specially adapted to the purpose in hand, are of more service to an imperiled vessel than is the aid which may be expected from a chance rescuer. To provide such skill, machinery, and appliances, and to keep them ready for instant service, though they may be called for but occasionally, is now regarded as a meritorious act, calling for a liberal award.

*The Lamington*, 86 F. 675, 684 (2d Cir.1898). Nevertheless, the promotion of professional salvors must place responsibility on that industry. Salvage law generously rewards those holding themselves out as professional salvors because this class of marine-rescuers is believed to have expertise and equipment superior to that of the chance rescuer. *Id.* Correspondingly, a mariner holding himself out as a professional salvor and inviting reliance on implicit or explicit guarantees of superior expertise and equipment will have his performance evaluated more closely than would the chance salvor. The professional salvor may be liable if he knew or reasonably should have known that the job that he volunteered to undertake was beyond his capacity as a professional.

 In justifying the heightened responsibility of professional salvors, the Court draws guidance from the purpose of mari-

time law: "to encourage the saving of life and property at sea by prompt and beneficial action on the part of whoever by chance is in proximity to the distressed property." BENEDICT at § 111. Unlike the truly "chance" salvor, the professional salvor is in the business of rescue and may have many salvage operations going on at any given time. *Id.* at § 81. To "encourage the saving of life and property" by professional salvors, salvage law must provide incentive for the best judgment and efforts of these people. Salvage law does this in part by allowing generous awards to professional salvors for successful operations. *B.V. Bureau Wijsmuller*, 487 F.Supp. at 172. To provide generous reward without responsibility, however, invites imprudent and incautious behavior on the part of professional salvors. Defendants, through this Motion to Dismiss, ask the Court to protect professional salvors by making them liable only when their wilful misconduct or gross negligence causes a salvage operation to fail. This level of protection, though, is incompatible with the purpose of maritime law. As to professional salvors, salvage law promotes thoughtful preparation and the reasonable utilization of resources. Accordingly, professional salvors may be liable for simple negligence for taking on jobs beyond the capacity of the salvor because of inadequate equipment or expertise.

▮ The Court makes explicit, however, that professional salvors are not liable in simple negligence merely for the failure of a salvage operation. *The Noah's Ark*, 292 F.2d at 441. In the absence of a distinguishable injury, the under-equipped or inexperienced professional who, in a non-emergency situation, gambles with the rescue of a vessel may be liable for simple negligence. *See* BENEDICT at § 122 ("The skill of the lone salvor who chances upon a distressed vessel on the high seas and renders assistance with no aid readily available, will not be examined too critically."). The exigencies of circumstance play a large role in determining whether a professional salvor's efforts were reasonable. A list of the factors determinant of a professional salvor's reasonableness in taking on a salvage job would certainly include the nature of the peril and the availability of alternate and perhaps more qualified salvors.

*See id.* Nevertheless, the factual circumstances surrounding Defendants' decision to salvage the JADE CAT in this case is a matter left for future development. For the purposes of Defendants' Motion to Dismiss, Plaintiff has made allegations of misconduct on the part Defendants as professional salvors sufficient to state a valid cause of action.

### III. CONCLUSION

Defendant Sea Tow—Hampton Roads' Motion to Dismiss both the contract and negligence claims is **DENIED.** Defendant Watson's Motion to Dismiss the contract claim is **GRANTED,** but the motion as it relates to the negligence claim is **DENIED.** As noted above, Defendants' Motion for Summary Judgment as to Plaintiff's gross negligence claim for the failed salvage of the JADE CAT was previously **DENIED** from the bench.

**IT IS SO ORDERED.**