**Glen KORPI, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. C–95–3170 FSL.**

United States District Court,
N.D. California.

Feb. 26, 1997.

Jeffrey Cowan, Seattle, WA and Paula Ann Brown, Oakland, CA, for Plaintiff.

Brian Judge, Stephen Campbell, U.S. Dept. of Justice, Civil Division, San Francisco, CA and Ross Sargent, Lieutenant, U.S. Coast Guard, Alameda, CA, for Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

LANGFORD, United States Chief Magistrate Judge.

## I. INTRODUCTION

The morning of June 5, 1995, Plaintiff Glen Korpi was sailing his sailboat *Dialogue* south along the California coast, in the vicinity of the Monterey Peninsula. By mid-afternoon, he had been plucked from the surf off Asilomar State Beach, California by a United States Coast Guard helicopter, and the *Dialogue* had grounded on the rocks.

Mr. Korpi contends that he was safely anchored, seaward of the surf line. He himself was in no distress, but his self-steering had broken and his engine had stopped running, due to either lack of fuel or a clogged fuel filter. All he needed was a tow into Monterey Harbor, so he could make repairs.

He believes that the crew of the Coast Guard motor lifeboat (MLB) endangered his life and lost his boat by forcing him to cut his anchor line, before attempting to pass him a towline and taking his boat in tow. The attempt was unsuccessful, and, although he himself escaped with minor injuries, his boat was lost.

The Coast Guard paints a different picture: of a lost sailor, trapped on a lee shore [1], in gale conditions and confused seas, being blown toward the rocks, dragging anchor toward inevitable doom. After Korpi radioed for assistance, they arrived to find a boat moving constantly on its anchor line, in danger of crashing into the MLB, or having the MLB dropped on it by a wave. The crew and its commander, experienced in search

---

1. A lee shore is an area where the prevailing wind is blowing toward the land.

and rescue, weighed all the circumstances, and decided on the safest course of action, for both boats: get rid of the *Dialogue's* anchor line, so it wouldn't foul the MLB's propellers; pass a heaving line with towline attached, and tow the sailboat to safety. But Mr. Korpi couldn't help. He couldn't get the towline aboard and so the lighter heaving line snapped and the boat quickly crashed on the rocks. Although the sailboat and most' of its equipment was lost, no one was killed, or seriously injured.

Mr. Korpi brought an action against the United States for personal injury, loss of his vessel, and the costs of wreck removal.

The United States denied liability.

The parties consented to a trial before a magistrate judge. The case was tried by the court on November 18 through 21, 1996. Appearing for Plaintiff were Jeffrey Cowan, Esq., Seattle, Washington, and Paula Ann Brown, Esq., Oakland, California. Appearing for Defendant were Brian Judge, Esq., and Stephen Campbell, Esq., United States Department of Justice, Civil Division, San Francisco, California, and Ross Sargent, Esq., Lieutenant, United States Coast Guard, Alameda, California.

The parties submitted proposed findings of fact and conclusions of law December 31, 1996 and the matter was submitted.

## II. FINDINGS OF FACT

1. The *Dialogue,* built in 1983, was a 27 foot long, fiberglass, cutter rigged sloop displacing 8,700 lbs., with a beam of 8 feet 8 inches, a draft of 4 feet 4 inches, and equipped with a 20 horsepower inboard diesel engine which required maintenance at 150 hour intervals. There was a 33 gallon fuel tank aboard which gave the dialogue a maximum 500 nautical mile cruising radius, which was reduced during engine use, in other than calm seas, or when running at higher speeds.

2. The 44″ Motor Life Boat (MLB) CG–44346 is a self-bailing and self-righting boat designed for search and rescue in heavy surf and seas. It is 44 feet 1-½ inches long, with a beam of 12 feet 8 inches, a draft of 3 feet 6 inches, and displacement of 35,360 lbs. The twin 185 horsepower diesel engines produce a maximum speed of 14 knots. On June 5, 1995, the MLB had a crew of BM2 Sean Rork, coxswain; BM2 Dennis McGraw, also a qualified coxswain serving as boat crew; BM3 Dane Ramos, boat crew; MK3 Eric Koppes, boat engineer; and SN Mike Culver. The coxswain is in charge of the boat and crew during a mission and is responsible for their safety. "You can't help anybody if everybody is hurt ...",[2] Rork had participated in 100 search and rescue missions in the year prior to June 5, 1995, almost all involving boats, either power or sail. His crew were also experienced in search and rescue.

3. The HH60A helicopter CG–6008 is a dual-engine helicopter which normally has a crew of a pilot, co-pilot and one aircrewman. On June 5, 1995, because the CG–6008 was on a training mission, it had two aircrewman instead of just one. Depending on the circumstances and conditions, the helicopter is capable of hoisting people from the water or directly from a vessel.

4. On May 24, 1995, Mr. Korpi and his wife departed Dana Point, California, enroute Santa Barbara, California. In Santa Barbara, they slept for several hours and Mrs. Korpi decided to return to Dana Point, while Mr. Korpi then continued the voyage alone enroute Seattle, Washington, a 1,200 nautical mile journey with no planned landfall in between. He had allotted himself two weeks time for this voyage. He had sufficient fuel to motor 500 nautical miles.

5. At the time of this voyage, Mr. Korpi was a 61 year old man whose sailing experience included sailing eleven-days from St. Thomas in the British Virgin Islands, to Fort Lauderdale, Florida, not singlehanded. His longest previous singlehanded voyages were 36 hours round trip from Dana Point to San Clemente, and 300 miles, across Lake Michigan. Mr. Korpi's sailing experience aboard *Dialogue* included sailing between mainland California and the Channel islands.

6. Mr. Korpi, whose uncorrected vision required him to wear corrective eyeglasses

2. Tr. November 19, 1996, p. 63: 8–11.

all his waking hours, lost them at some point on June 5, 1995.

7. As Mr. Korpi headed north, he was forced to "motorsail", that is operate his engine with the sails raised, into winds reaching as high as 40 knots and seas and swells of at least six feet. During the eight or nine days it took to reach the area of Cape Mendocino, Mr. Korpi testified that he slept as much as sixteen hours a day, in 20 minute increments. For the 72 hour period immediately preceding the grounding, he ate only hot chocolate, coffee, granola bars, nuts, cookies and similar snack foods.

8. Mr. Korpi realized he could not reach Seattle in the time he had allotted for the voyage, so he turned south, intending to return to Dana Point. At no time on his voyage north had he made landfall to attempt to replenish his food or fuel supplies to rest for an extended period.

9. Approximately six hours after turning south, the sailboat's automatic steering device failed. Several hours later, near the Farrallon Islands, Mr. Korpi decided he could not continue all the way to Dana Point without his automatic steering device and decided to head for Monterey Harbor. From this point on, it was necessary for Mr. Korpi to continually man the tiller in order to steer the *Dialogue*.

10. At approximately 2:30 a.m. of June 5, 1996, Mr. Korpi, who was falling asleep at the tiller, turned *Dialogue* into the 25 to 35 knot wind and hove to in the vicinity of Monterey Canyon in an attempt to get some rest, as his boat rode the ten foot swells which were topped by 4 to 6 foot seas.

11. At about 10:48 on the morning of June 5, Mr. Korpi contacted the U.S. Coast Guard Group Monterey ("Group Monterey") by radio for advice on entering Monterey harbor. He informed Group Monterey that he was not personally in distress, and asked for landmarks to assist his entry in to the harbor. Korpi stated that he was four miles from Monterey Harbor and had either run out of fuel[3] or had a clogged fuel filter.

12. From 10:48 a.m. until it went aground, the *Dialogue* had no engine power. Its sole means of propulsion was by sail. Mr. Korpi did not attempt to check or replace his fuel filter although he had spare fuel filters aboard.

13. He believed that he could easily reach the harbor, having sailed in before. He requested advice, but internal Coast Guard regulations prohibit Coast Guard personnel from providing information such as courses to steer since this type of information is unique to the particular vessel and heavily dependent on the local weather and sea conditions encountered at the scene. Instead, TC1 Lewandowski, the Coast Guard radio watchstander at Group Monterey, offered to assist him in contacting the Monterey Harbor Master when he was closer to shore since Mr. Korpi's radio did not have the channel the harbormaster monitored.

14. At about 11:30, Mr. Korpi again radioed the Coast Guard, asking for landmarks to assist him in entering the harbor. He gave Group Monterey his position as 36–37.4N 121–57.7W, which was southwest of Pt. Pinos. Mr. Korpi radioed Group Monterey that he was going to try to sail around Pt. Pinos.

15. Mr. Korpi stated that he saw sandy beaches, a building like a hotel, and a building with a cupola. He was unaware of what Point Pinos looked like. As shown on National Oceanographic and Aerospace Administration (NOAA) navigational chart 18685, Point Pinos, on the tip of the Monterey Peninsula, has a 89 foot tall lighthouse with a radio beacon on it and would be the first landfall for a sailor, like Mr. Korpi, approaching Monterey Harbor from the north.

16. In the area where Mr. Korpi was sailing, the winds were from the northwest at 25 to 35 knots, the seas were also from the northwest at 4 to 7 feet on top of 11 to 12 foot swells also from the northwest.

17. At 11:28 a.m., at the request of Mr. Korpi, TC1 Lewandowski passed to Mr. Kor-

---

**3.** At the hearing, Mr. Korpi testified that he had operated his engine 60% of the time between

Santa Barbara and Point Pins.

pi the latitude and longitude of Monterey Harbor.

18. Mr. Korpi gave TC1 Lewandowski his Global Positioning System (GPS) position so the Coast Guard could plot his position on a chart, something Mr. Korpi had not done himself. TC1 Lewandowski confirmed that Mr. Korpi was southwest of Point Pinos, on the wrong side of the Monterey Peninsula. This explains why Mr. Korpi was unable to recognize any landmarks in Monterey Harbor.

19. At the conclusion of this conversation, TC1 Lewandowski requested that Mr. Korpi remain well offshore.

20. Mr. Korpi testified that after passing his GPS position at 12:19 p.m. he continued to sail a south-easterly course toward shore while waiting for the Coast Guard to tell him where he was located.

21. About 12:55, Mr. Korpi realized that he would not be able to sail around Pt. Pinos. He radioed Group Monterey, and told them that he was going to deploy his anchor to keep from drifting ashore. About ten minutes later, he informed Group Monterey that his anchor was holding, and that he was preparing a second anchor in case the first began to drag.

22. Mr. Korpi further testified that the Coast Guard never told him that he was located southwest of Point Pinos; however, on Defendant's Exhibit J, a tape of the radio communications, TC1 Lewandowski can be clearly heard saying, "Plot you southwest of Point Pinos, is that correct?" Mr. Korpi acknowledged this communication, but was unable to confirm this location because he did not know what Point Pinos looked like.

23. At approximately 12:30 p.m., while driving to work in a radio equipped vehicle, a State Park lifeguard named Erik Landry saw the *Dialogue* about three-quarters of a mile off Asilomar Beach. Noting the extremely windy and rough weather, he radioed Mr. Korpi who confirmed that he was in no personal distress but had no power other than his sails. Mr. Landry passed his observation of *Dialogue* to the Coast Guard. During the five minutes that Mr. Landry watched the *Dialogue*, he did not see it move and thought *Dialogue* might have been anchored.

24. At 12:55 p.m., Mr. Korpi radioed Group Monterey stating he was unable to round Point Pinos and was going to throw over some anchors. He requested the Coast Guard's advice and reported he was about one mile off shore. The radio operator thought he sounded distressed. The helicopter pilot, who heard the radio transmission, described the Korpi's voice as tired, exhausted, high-pitched, and that of a "person in trouble." [4]

25. Mr. Korpi specifically stated, "I'm trapped. I can't get around the point on one end and the wind's going to blow me on shore going south." (Def.Ex. J) Without his engine and with only his small storm jib raised, Mr. Korpi could not have sailed *Dialogue* to safety. To sail away from the coast, Mr. Korpi would have had to raise his mainsail and replace his storm jib with a working jib. Without help, this would have taken 15 minutes and within that time he would have gone aground. Korpi testified that raising more sail wouldn't have helped, since he would have been sailing into the wind.

26. Mr. Korpi also testified that, once he plotted his position, he realized he was on a lee shore and became concerned. He immediately started his engine and began to motor away from shore in a northwesterly direction, but his engine failed after a few minutes. He then immediately deployed his anchor.

27. TC1 Lewandowski requested that Mr. Korpi deploy his anchor and stated he was sending a vessel to assist Mr. Korpi. Mr. Korpi did not attempt to contact any other vessels for assistance and no offers of assistance were refused by Mr. Korpi nor by the Coast Guard. There was no proof of any other vessels being in the area.

28. When Mr. Korpi first dropped his anchor at about 12:55, the Group Monterey controller sounded the "SAR" (search and rescue) alarm. The crew of motor lifeboat ("MLB") 44346 got underway at 1:01, leaving the Monterey Coast Guard station for the

4. Tr. November 18, 1996, p. 13:1.

position where the *Dialogue* was anchored. Although the MLB was in radio contact with Group Monterey, Group Monterey did not inform the MLB that Mr. Korpi had twice advised that the *Dialogue's* anchor was holding.

29. By 1:01 p.m., Group Monterey's MLB was underway enroute the *Dialogue's* position.

30. At 1:06 p.m., Mr. Korpi radioed the Group reporting that his anchor was holding. His voice was weak and his breathing labored. He admitted that he was hyperventilating.

31. Although Mr. Korpi reported that his anchor was holding, he did not take a fix using either GPS, visual bearings, fathometer readings or by any other means. He did not plot his position on a chart at any point while anchored so that he could compare it with later fixes to ensure that *Dialogue* remained in the same position and that his anchor was not dragging. He based this opinion on the absence of any sound from the anchor, the distance to the rocks, the positions of the tiller and anchor line, and the motion of the boat.

32. During the 1:06 p.m. communication with the Group, Mr. Korpi asked for an estimated time of arrival for the MLB. Upon being informed that the MLB would reach him in 20 minutes, Mr. Korpi stated that he thought he could hold on that long.

33. The anchor Mr. Korpi was using was a 25 pound, CQR anchor. Although he also had a 35 pound aboard, he did not use it. He had difficulty deploying it, because the chain was stuck.

34. At 1:23, Group Monterey contacted Mr. Korpi, who told them that the first anchor was holding, and that he did not need to deploy the second anchor. At no time during these radio transmissions did Mr. Korpi state that he was personally in distress or ask for physical assistance.

35. At 1:28 p.m., the MLB had rounded Point Pinos, but, because of the heavy seas, was unable to see *Dialogue*. Mr. Korpi had earlier reported that when he was below, where his radio was located, he would not be able to see the MLB until it was right on top of him. The Group had Mr. Korpi count from one to five and back to zero so that the MLB could locate *Dialogue* using a radio direction finder.

36. At this time, a Coast Guard helicopter, CG–6008 (hereinafter "the helicopter"), on a training mission in Monterey Bay off Moss Landing, offered its assistance. The crew of the helicopter was LT F.C. Riedlin (Aircraft Commander), LT B.L. Nelson, (Copilot), ADC W.F. Boyd (Flight Mechanic) and AMC W.B. Bruce (Basic Aircrewman). LT Nelson flew the helicopter throughout this incident. After being briefed about the *Dialogue* and a second vessel in distress that the Group was attempting to rescue, the helicopter stated it would do an overflight of *Dialogue*. It first flew over at 200 feet, then at 100 feet. The helicopter crew saw a sailboat "sailing back and forth on its anchor line," and the MLB approaching.

37. The precise location where the *Dialogue* was anchored is difficult to determine. The coordinates radioed by Mr. Korpi at about 1:31—36–37.88N 121–56.63W—were derived from his GPS receiver. However, testimony by Captain Calvin Bourke, a maritime expert, showed that GPS receivers have a built-in error which makes them unreliable in close-in situations. Dennis McGraw, who was monitoring the MLB's fathometer, testified that the depth of the water at the moment the MLB arrived at the *Dialogue's* location was 58 feet.

38. Captain Bourke further testified that this GPS position was inaccurate and that the *Dialogue* was located three quarters of a mile offshore along the ten fathom depth curve. While he agreed that GPS is the most accurate commercially available electronic navigation system and is designed to be accurate to within 100 yards, he stated that it is only good for large ships transitting the open ocean and can be off by as much as two to three miles.

39. Captain Bourke based his opinion on the statements of Mr. Landry, the Coast Guard pilots, other deposition testimony which he could not recall, and the 58 foot fathometer reading by the crew of the MLB. Mr. Landry, however, had last seen *Dialogue*

30 minutes before the anchor was deployed, and the Coast Guard pilots, arriving on scene after the *Dialogue* had anchored, placed the *Dialogue* at approximately 100 to 200 yards from the nearest rocks. Finally, simply because a fathometer reading is close to ten fathoms does not mean it must be close to the ten fathom curve. Fathom curves are simply an arbitrarily drawn line linking positions of the same depth. Some charts currently in use are based on soundings taken forty to fifty years ago. Not all positions having a depth of close to ten fathoms will be either on or near the ten fathom curve and can be found closer into shore as a "deep spot".

40. Mr. Korpi and Petty Officer Rork[5] both testified that the *Dialogue* was seaward of the surf line when the MLB arrived on scene. A photograph taken of the MLB at the time of its arrival shows both vessels in the swells beyond the breaking surf.[6] Rork also testified that he tried to maintain a position well outside the apparent surf line since it was impossible to be sure which waves would break.[7]

41. Although the MLB was equipped with radar and loran, both of which are capable of determining precise positions, the MLB crew never took a navigational fix of its position. However, Plaintiff's expert testified that radar would have been "worthless" in establishing the *Dialogue's* position.

42. This court finds that there is no conclusive evidence establishing the exact position of the *Dialogue* at the time its anchor was deployed, so there is no way to establish whether it changed position between the time it first anchored and the time the MLB arrived.

43. The proper scope for an anchor to function properly (the ratio of anchor chain to the depth of the water plus the vessel's freeboard) under normal conditions is five times the depth of the water plus the freeboard. The minimum amount of anchor chain required at a depth of 58 feet is there-

fore 290 feet. Greater scope is generally required under rougher conditions such as those at the scene of the rescue. All of this assumes that the anchor has taken hold on the bottom.

44. The *Dialogue's* anchor chain was 270 feet long. Capt. Bourke testified that the force keeping a vessel at anchor in place derives from the catenary[8] of the anchor chain, not the weight of the anchor. In water of a depth of about 60 feet, 270 feet of anchor chain are adequate to hold a vessel of the *Dialogue's* size and design securely in place. Although the ideal ratio of chain to depth is greater, such ideal applies primarily to merchant ships of up to 200,000 tons, not to sailing yachts of 4 tons, such as the *Dialogue.*

45. Captain Bourke testified that, in his opinion, the observed movements of the *Dialogue* were exactly what would be predicted for a vessel of its type at anchor in the conditions that existed on June 5, 1995. Capt. Bourke's testimony was that as the *Dialogue* rose on the swells, the catenary would extended, causing the anchor chain to appear to run obliquely forward from the boat's bow. When the *Dialogue* went down into the trough between swells, the catenary would contract, pulling the boat down into the trough. The chain would then appear to go vertically down into the water. It is this flexing of the catenary that absorbs the impact of the wave energy, and keeps the boat in place.

46. At the same time, because of the wind, the *Dialogue* would be expected to yaw on its anchor line. With its small jib sail still set, and with the windage created by the boat's freeboard—the portion of the hull above the water line, which on this sailboat was three feet—the *Dialogue* would predictably swing on the anchor chain through an arc, then swing the other way when its heading relative to the wind caused it to, in effect, tack. Capt. Bourke's testimony was that such yawing would occur only if the *Dialogue* was securely anchored. If the anchor was

---

5. Tr. Nov. 19, 1996, p. 55:22–56:5.

6. Defendant's Ex. B.

7. Tr. November 19, 1996, p. 23:12–15.

8. The horizontal curve of the anchor line through the water and on the bottom.

not holding, the chain would not "snap" the *Dialogue* back to yaw the opposite way.

47. These movements of the *Dialogue* were observed by the Coast Guard personnel aboard the MLB. All the crew members of the MLB who testified stated that the *Dialogue's* anchor line appeared to move from a vertical position to an oblique angle from the bow. The described the jerking of the anchor chain as "walking." They all testified that the *Dialogue* was yawing on its anchor chain. This same yawing movement was observed by Lt. Nelson, who was flying the helicopter hovering overhead. Lt. Nelson observed that the *Dialogue* was at anchor, apparently stationary except for its movement, "sailing" back and forth on its anchor line.[9]

48. NOAA chart number 18685 indicates the presence of rocks and kelp on the bottom at the approximate location of the *Dialogue.* This chart is dated 1983. Witnesses familiar with the area testified that there are also a number of large rocks in the vicinity, some of which would be covered depending on the state of the tide. At this time, the tide was moving from low tide to high tide.

49. Anchoring on a rocky bottom is difficult because rocks prevent the anchor from getting a bite except when the flukes are lodged in a crevice. Kelp also poses a problem because it can prevent the anchor from getting through to the bottom.[10] The anchor may simply become tangled in the kelp and then repeatedly tear free as the anchor takes a strain. A crewman who also frequently fished in the area where the *Dialogue* was anchored testified that the bottom there is "mainly just kelp and rock." [11]

50. At 1:34 p.m., the MLB arrived on scene and found the *Dialogue* with her bow generally pointing offshore and heading into the wind, seas and incoming tide, about 100 to 200 yards from the closest visible rocks.

The crew observed the *Dialogue's* anchor line tending up and down rather than out at an angle with the boat yawing (veering from side to side) heavily and moving toward shore. Plaintiff's expert, Captain Bourke, interpreted this to mean that the boat was riding at anchor. However, based on their initial observations, and their extensive experience with search and rescue operations, the crew concluded that the *Dialogue's* anchor was dragging, and that without their intervention *Dialogue* would go aground. Throughout the entire rescue, the MLB's crew observed *Dialogue* and the MLB move closer to the nearby rocks, based on a number of observations and "seaman's eye." [12]

51. Upon arriving on scene, BM2 McGraw checked the MLB's fathometer and reported to BM2 Rork a depth of 58 feet. While the crew discussed their towing options, BM2 Rork was "station keeping" on the *Dialogue,* meaning he maneuvered the MLB so as to maintain a consistent relative bearing and distance from the. *Dialogue* even while the latter would move. This was hard work.[13] He constantly observed his crew, the *Dialogue,* the sea conditions and the rocks. He described it as having his "head on a swivel." [14] While the crew discussed their options, both the *Dialogue* and the MLB continued to move closer to shore. When the discussion was completed, BM2 McGraw again checked the fathometer and reported a depth of 33 feet. The crew could also observe that both boats were moving closer to a particular large rock.[15] This confirmed the urgency of the situation for the MLB crew.

52. Based on the observations of the MLB crew that both boats were moving closer to the visible rocks, that the anchor line was tending up and down, that the *Dialogue* was yawing heavily, that the MLB's fathometer readings were decreasing as the boats

9. Tr. November 18, 1996, p. 6:8–7:20.

10. Tr. November 19, 1996, p. 70:17–71:3.

11. Tr. November 21, 1996, p. 27:14.

12. Tr. November 20, 1996, p. 24:10–25:10; see also Tr. November 18, 1996 p. 18:19—p. 19:1, for a definition of "seaman's eye."

13. Tr. November 19, 1996, p. 68:22–69:4.

14. Tr. November 19, 1996, p. 69:23–24.

15. Tr. November 20, 1996 p. 24:14–25:10.

moved toward shore, that the bottom was rocky and covered with kelp, the surf, wind, and tide conditions, and the likelihood that *Dialogue's* anchor rode lacked sufficient scope for the weather conditions and the anchor was not holding on the bottom, this court finds that *Dialogue's* anchor was dragging and the vessel was being set onto the rocks.

53. After the MLB arrived at the *Dialogue's* position, Petty Officer Rork took his time to assess the situation, and obtain the opinions of his crew members.[16] The factors he normally considered in choosing what approach to make in towing a vessel included the positions of the boats, the surroundings, sea state, size of the vessel, and configuration of the vessel.[17]

54. With *Dialogue* yawing heavily, BM2 Rork was concerned about approaching too close to *Dialogue,* because he was worried about getting *Dialogue's* anchor line fouled in his vessel's propellers.[18] If this happened, both vessels would have gone aground on the rocky coast with the possible loss of life. Rork described a "constant battle to stay in a relative position with him."[19] His concern was reasonable under the circumstances.

55. While station keeping, BM2 Rork. discussed his towing options with his crew.[20] They considered deanchoring the vessel. This involves attaching a shackle to the end of the tow line and then onto the anchor line. As the towing vessel moves away, the shackle slides down the anchor line until it contacts the anchor which is pulled up in the process. They rejected this because (1) they did not believe that the 1″ nylon line at the boat end of Mr. Korpi's anchor chain was strong enough; (2) the sea conditions made it too dangerous for either Mr. Korpi or one of the MLB's crew to attempt to attach the shackle[21]; and (3) they were unsure whether the

shackle was large enough to slide down the anchor chain. BM2 Rork's decision to reject this approach was a reasonable decision under the circumstances.

56. The MLB crew considered heaving the towline directly to the *Dialogue* without using a heaving line, but, given the weight of the line, they reasonably concluded that they could not safely maneuver close enough.

57. The MLB crew also considered using a heaving line attached to the towline, having Mr. Korpi pull on the line until the towline was aboard Dialogue, attaching the towline to the sailboat's bow cleat, establishing the tow and then having the *Dialogue* raise its anchor or cut the anchor line. This was rejected because with the sea conditions and the *Dialogue* yawing heavily, BM2 Rork did not believe he could safely maneuver the MLB close enough to *Dialogue* to pass the ·heaving line. This alternative would also have resulted in both the anchor line and the towline being in the water at the same time, increasing the danger of one of the lines becoming fouled in the MLB's propellers.[22] His decision to reject this method was a reasonable one under the circumstances.

58. The 4 to 7 foot seas atop the 11 to 12 foot swells made it too dangerous to transfer anyone between the MLB and the *Dialogue.*

59. BM2 Rork observed that *Dialogue's* anchor was secured to the bow cleat located on the boat's centerline. This cleat was the only cleat the boat crew could see on *Dialogue's* bow to which the towline could be secured. BM2 Rork also observed the storm sail partially set and partially "bunched up on deck" and several other lines on *Dialogue's* bow. He was concerned with the amount of gear on the bow which could potentially foul the towline. This was a reasonable concern.

16. Trial transcript, Nov.19, 1996, 63:23–64:10.

17. Tr. November 19, 1996, p. 66:17–20.

18. Tr. November 20, 1996, p. 19:18–21.

19. Tr. November 19, 1996 p. 62:3–4.

20. Tr. November 20, 1996, pp. 18–23.

21. It was dangerous because Mr. Korpi would have had to lean out over the bow of his boat, which had been taking white water over the bow (Tr. November 19, 1996, p. 101:17–101:2): he might have been swept overboard. On the MLB, crew were not permitted forward of the coxswain's chair for much the same reason. At one point coxswain could do was shout, "Hold on!" (Tr. November 20, 1996, p. 75:23—p.76:2).

22. Tr. November 19, 1996, p. 77: 5–8.

60. The crew of the MLB and Mr. Korpi had difficulties communicating throughout the rescue since both parties had to shout against the strong winds and waves. This was caused in part by the loss of the MLB's loudhailer, which had become inoperative because of the amount of water the MLB took over the top of the pilothouse which is where the loudhailer is located. Another cause of the communications difficulties was the fact that Mr. Korpi's only VHF–FM radio was below decks in his cabin and was not portable. Since Mr. Korpi was the only person aboard *Dialogue*, no radio communications were possible while he was on deck. Even then, distance, wind, and the noise of the MLB engine force Mr. Korpi and the MLB crew to shout to be heard.

61. Because *Dialogue's* yawing made it too difficult to safely approach close enough to *Dialogue* to throw a heaving line, BM2 Rork and his crew decided the best approach would be to have Mr. Korpi first cut his anchor line before they threw the heaving line. Based on their training and experience, they expected that once *Dialogue* was cut from its anchor line, it would stop yawing wildly, settle beam to the seas, and they would be able to safely approach it.[23] In fact, after the anchor line was cut, the *Dialogue* did settle almost beam to, slightly quartering the seas.[24]

62. BM2 Rork then maneuvered the MLB to the *Dialogue's* portside and the crew shouted to Mr. Korpi their plan to have him cut his anchor line so the crew could then safely pass the towline. Mr. Korpi initially misunderstood them. He thought they wanted him to haul up the anchor and told them he could not. He lacked the physical strength to do this manually and, if he used his windlass, he believed he would be aground before he could haul the anchor aboard. He therefore showed the MLB crew his knife, and then cut his anchor line. At this point, *Dialogue* was approximately 20 to 30 yards from the nearest rocks.

63. A 60 foot, light heaving line was already attached to the 3 inch, double braided nylon towline. BM3 Ramos communicated with words and gestures that Mr. Korpi was to pull on the heaving line until he got the towline aboard *Dialogue*. Mr. Korpi indicated he understood. BM3 Ramos than attempted to throw the heaving line to Mr. Korpi, but it fell short. The MLB maneuvered to be upwind of the *Dialogue*, while the heaving line was retrieved by BM3 Ramos and Mr. Korpi caught it on the second attempt.

64. Despite BM3 Ramos' directions, Mr. Korpi immediately secured the heaving line to his bow cleat, and stepped away from it. The MLB crew shouted to get his attention. Once they got his attention, they told him that he needed to pull the towline aboard.[25] BM2 McGraw and MK3 Koppes testified that they saw Mr. Korpi untie the heaving line and then begin pulling on it; Mr. Korpi denied untying the heaving line.

65. The MLB's towline is kept on a free-turning reel, adjacent to a towing bitt. The speed with which the towline is paid out, the amount of towline that is paid out, the amount of slack available to the towed vessel, and the manner and time in which the towline is made fast to the towing bitt are all under the control of the MLB's crew.[26]

66. As Mr. Korpi pulled on the heaving line, BM3 Ramos tended the towline meaning he was holding the line in his hand and paying out slack. There was also slack on the MLB's well deck between BM3 Ramos and the MLB's tow bitt. The towline ran over the tow bitt to where it was coiled on the tow reel. There was also slack line between the tow bitt and the reel. MK3 Koppes was tending the towline at the tow bitt. During the time Mr. Korpi was pulling on the towline, MK3 Koppes kept slack in the line and never secured it to the tow bitt. A working turn was taken only when the MLB prepared to take the *Dialogue* in tow.[27]

23. Tr. November 19, 1996, p. 81:22–82:1.

24. Tr. November 19, 1996, p. 82:19–83:3.

25. Tr. November 21, 1996 p. 35:14.

26. Tr., Nov. 19, 1996, p. 33:15–34:9.

27. Tr. November 21, 1996, p. 18:17–22.

67. As Mr. Korpi pulled in the heaving line, he was pulling it over *Dialogue's* safety rail, instead of taking a fair lead under the rail. This may have placed a greater strain on the heaving line. After hauling approximately 42 feet of heaving-line aboard *Dialogue*, Mr. Korpi was unable to pull any more line aboard. He secured that line to his bow cleat. The towline was approximately 15 feet from Mr. Korpi and the MLB crew could see the eye of the towline coming out of the water. Mr. Korpi assumed that the towline was fouled on the MLB, so he gestured for the MLB to move away to give him more slack.

68. The towline was not fouled. It was heavy because it was wet and the seas were pulling on it. Because he was fatigued from his lack of sleep, his lack of nutritious food, and his being pounded by the seas as he sailed alone for 10 days, Mr. Korpi was unable to pull the towline aboard.

69. This court finds, as plaintiff's own seamanship expert, Captain Bourke, admitted, that if Mr. Korpi had been able to bring the towline aboard *Dialogue*, the MLB would have been able to tow him to safety.

70. When Mr. Korpi secured the heaving line and gestured with his hand, BM2 Rork assumed that Mr. Korpi wanted him to start towing the *Dialogue*. The MLB was only a boat length, 44 feet, away from the nearest rocks. Because the rocks were so close, BM2 Rork knew he had no choice but to immediately attempt to tow *Dialogue* with only the lighter heaving line attached.[28] As he began to move forward and before the towline itself began to take a strain, the heaving line parted.

71. As the *Dialogue* approached the breaking surf, Mr. Korpi raced from the bow to the cockpit, where he threw over the second anchor. It caught on the bottom, but its line parted, and the *Dialogue* struck ground. By this time, the *Dialogue's* keel was hitting the rocks and the boat was in the surf.

72. At this point, the hovering helicopter lowered a rescue basket to Mr. Korpi in *Dialogue's* open cockpit. Mr. Korpi dove headfirst into the basket which was against the safety rail surrounding the cockpit. At this point, a large wave hit *Dialogue*. The hoist cable attached to the basket apparently became caught on *Dialogue's* rigging or safety rail and parted. Both Mr. Korpi and the basket ended up in the water with Mr. Korpi several feet from the basket. He tried to inflate his life vest, but it didn't inflate.

73. The helicopter crew quickly spliced a rescue strop, or harness, onto the cable and lowered it to Mr. Korpi. To avoid the possibility of Mr. Korpi slipping out of the harness, instead of lifting him into the helicopter, he was raised just above the waves and transported the short distance to the beach where onlookers assisted him.

74. *Dialogue* went aground on a rocky point jutting out a small distance from the northern part of Asilomar Beach, near the intersection of Sunset Drive and Arena. Gary Roller, a local salvor, assessed the costs of salvaging *Dialogue* to exceed its value. At Mr. Korpi's direction, he demolished *Dialogue* and removed it at a cost of $18,373.00, less $73.00 received for salvaging the keel.

75. Mr. Korpi recovered a number of items from the wreckage, including the mast and boom, rigging, sails, the engine, tankage, cushions and personal effects. The salvaged gear filled a small U–Haul truck. The boom and the mast were later sold for $500.00. He also testified that he incurred hotel, car rental, and miscellaneous costs as a result of the loss of the *Dialogue*. The total of these costs was approximately $5,000.00.

76. Mr. Korpi broke two ribs during the rescue. The ribs were mildly angulated with no displacement. He had medical expenses of $1,321.51. He suffered no lost income.

77. General damages claimed by Mr. Korpi for pain and suffering related to the loss of the *Dialogue* are $15,000.00.

78. Paul Baker, a yacht broker who testified on behalf of plaintiff as an expert on the valuation of sailing yachts, set the fair market value of the *Dialogue*, as of June 5, 1995, at $54,000.00. Mr. Baker testified that well-built pocket cruisers such as the Vancouver

---

**28.** Tr. November 19, 1996, p. 90:19–24.

27's occupy a niche market, and are in considerable demand. His own experience in selling boats like the *Dialogue* was that they not only maintained their value, but often increased in value due to demand.

79. The United States offered by deposition the expert opinion of Richard Day, that the fair market value of the *Dialogue* was $43,000.00. In a report previously prepared for the United States by Mr. Day, he had valued the *Dialogue* at $47,000.00. Mr. Day is a designer and surveyor, not a yacht salesman or broker.

80. Mr. Korpi had purchased the *Dialogue* in November 1992 for $43,000.00. Generally, boats do not appreciate in value, but small, offshore boats such as the Vancouver 27 may hold their value or even appreciate slightly.

81. The BUC Book is a guide to used boat prices compiled by taking information on yacht sales as reported by yacht brokers. The BUC Book gives a high and low retail price for various models of boats. These prices are adjusted for the area the boat is sold in and for the boat's condition and equipment. There is no BUC Book listing for a 1983 Vancouver 27 although there are listings for all other years between 1980 and 1985. In the edition of the BUC book published in 1995, a 1982 Vancouver 27 is valued between $35,300.00 and $39,200.00 and a 1984 Vancouver 27 is valued between $39,800.00 and $44,300.00. A 1983 Vancouver 27 can therefore be presumed to have a value of between $37,550.00 and $41,750.00.

82. There is no area adjustment for Southern California, *Dialogue's* homeport and its destination when it ran aground. A vessel with above average care and equipped with extra electrical and electronic gear is categorized as "Above BUC Condition" and 10–15% is added to its published price. A vessel which requires no additional work to be ready for sale and is normally equipped for its size is in "BUC condition" and its published price is not adjusted.

83. Adding 10% to the extrapolated values for a 1983 Vancouver 27 yields a range of between $41,305.00 and $45,925.00. The *Dialogue's* purchase price of $43,000.00 falls

approximately in the middle of this range. Given the limited market for Vancouver 27's, the purchase price of the *Dialogue* less than two years before the grounding is the best estimate of the *Dialogue's* value.

84. This court finds that the value of *Dialogue* at the time of its grounding was $43,000.00.

## III.  CONCLUSIONS OF LAW

1. The Court has subject matter jurisdiction under the provisions of the Public Vessels Act, 46 U.S.C.App. §§ 781–790 and consistent provisions of the Suits in Admiralty Act, 46 U.S.C.App. §§ 741–752, and Rule 9(h), Fed.R.Civ.P. The parties consented to bench trial before a magistrate judge pursuant to 28 U.S.C. § 636 et seq.

2. Under the Public Vessels Act, a party has the same rights against the United States as he would have against a private person in similar circumstances. *Canadian Aviator, Ltd. v. U.S.*, 324 U.S. 215, 228, 65 S.Ct. 639, 646, 89 L.Ed. 901 (1945).

3. A private party has no affirmative duty to rescue a vessel or person in distress. *Basic Boats, Inc. v. U.S.*, 352 F.Supp. 44, 48 (E.D.Va.1972); *Lacey v. U.S.*, 98 F.Supp. 219, 220 (D.Mass.1951); *see Frank v. U.S.*, 250 F.2d 178, 180 (3rd Cir. 1957), *see also Bunting v. U.S.*, 884 F.2d 1143, 1147 (9th Cir.1989). The Coast Guard, therefore, also has no affirmative duty to render aid to a vessel or person in distress. *Daley v. U.S.*, 499 F.Supp. 1005, 1009 (D.Mass.1980); *Shupe v. U.S.*, 1979 A.M.C. 2282, 2285 (C.D.Cal.1979) (not otherwise reported). The Coast Guard is not held to any higher standard of care in its rescue operations than a private person. *Basic Boats, supra.*

4. Although the Coast Guard is under no affirmative duty to render aid to a person or vessel on the high seas, *Daley v. U.S., Id.*, once having undertaken to do so, it is held to the same standard of care as private persons. *Petition of U.S.*, 216 F.Supp. 775 (D.Ore.1963).

5. One who attempts to render assistance to another at sea must act as a

reasonably prudent person under the circumstances of the case. 759 F.2d 1425, 1430–31 (9th Cir.1985).

6. The standard of care applicable in rescues undertaken at sea is that the rescuer will be liable for damages only (1) for negligent conduct that worsens the position of the victim, or (2) reckless and wanton conduct in performing the rescue. *Id., see also Bunting v. U.S., supra.*

7. Courts have long recognized the perils of the sea. "Of all the branches of jurisprudence, the admiralty must be the most hospitable to the impulses of man and law to save life and limb and property." *Grigsby v. Coastal Marine Service of Tex., Inc.,* 412 F.2d 1011, 1021 (5th Cir.1969), *cert. denied,* 396 U.S. 1033, 90 S.Ct. 612, 24 L.Ed.2d 531 (1970). A rescue attempt must be considered in the light of the circumstances that faced the rescuers when they acted and not with the wisdom of an "armchair admiral" *after* the fact. *Afran Transport Co. v. S/S Transcolorado,* 458 F.2d 164 (5th Cir.1972); *Magnolia Marine Transport v. Frye,* 875 F.Supp. 1216 (E.D.La 1994).

8. In applying these standards, courts will not second guess the decisions made by rescue personnel in the midst of the rescue attempt. *Johnson v. U.S.,* 378 F.2d 732 (9th Cir.1967). The standard of care exhibited by the rescuers is measured by the unique circumstances of the rescue. *Dreher v. U.S.,* 375 F.Supp. 1061 (N.D.Cal.1972). Acts which could amount to negligence under other circumstances will ordinarily be found non-negligent when rescue operations are being carried out. *Johnson,* 378 F.2d 732 (9th Cir.1967).

9. Negligence of the Plaintiff, alleged to have brought about the circumstances that prompted the rescue effort, is not relevant to calculating comparative fault. *Berg v. Chevron U.S.A., Inc.,* 759 F.2d 1425 (1985), *Id.; U.S. v. Gavagan,* 280 F.2d 319, 329 (5th Cir.1960). Such evidence is inadmissible. *Fox v. U.S.,* 934 F.Supp. 1133 (N.D.Cal.1996). This court excluded such evidence at trial, and has not considered it in arriving at its findings and conclusions.

10. Under admiralty law, comparative negligence, although not a complete bar to recovery, will reduce an award by the percentage of plaintiffs' own negligence. *Socony–Vacuum Oil Co. v. Smith,* 305 U.S. 424, 59 S.Ct. 262, 83 L.Ed. 265 (1939); *Kopczynski v. The Jacqueline,* 742 F.2d 555 (9th Cir.1984), *cert. denied,* 471 U.S. 1136, 105 S.Ct. 2677, 86 L.Ed.2d 696 (1985); *DuBose, v. Matson Nav. Co.,* 403 F.2d 875 (9th Cir. 1968). A plaintiff's comparative fault may constitute the majority of percentage of fault. *See, e.g., Saratoga Fishing Co. v. Marco Seattle, Inc.,* 69 F.3d 1432, 1443–44 (9th Cir. 1995) (plaintiff's comparative fault reduced its recovery by two-thirds).

11. The standard to be used in analyzing plaintiff's conduct is that of a reasonably prudent person under similar circumstances. PROSSER AND KEETON ON TORTS, § 65, pp. 453–54 (W. Keeton ed. 5th ed.1984); *Mroz v. Dravo Corp.,* 429 F.2d 1156, 1163 (3d Cir.1970); *Almaraz v. Universal Marine Corp.,* 472 F.2d 123, 124 (9th Cir.1972). In this instance, Plaintiff Korpi clearly failed to act as a reasonably prudent person by: 1.) by his decision to not replenish his fuel supply, by his failure to get adequate sleep, by his failure to eat nutritiously, by failing to examine or replace his fuel filter, all resulting in creating a condition which hamstrung the MLB crew's ability to function; and 2.) by his physical inability to pull the towline aboard *Dialogue.* Even if the MLB crew were negligent, their actions do not constitute a superseding "worsening" cause which would relieve Mr. Korpi of responsibility for the grounding. *Exxon Co. U.S.A. v. Sofec, Inc.,* —— U.S. ——, 116 S.Ct. 1813, 135 L.Ed.2d 113 (1996).

12. Defendant, United States of America, is not liable to plaintiff, Mr. Korpi.

Since the court heard evidence regarding damages, the court has made findings of fact regarding damages and will include conclusions of law regarding damages.

13. The measure of damages for the total loss of a vessel is the fair market value as of the date of the loss. *Miller v. U.S.,* 614 F.Supp. 948, 956 (D.Me.1985).

14. Pursuant to 46 U.S.C. § 743, any interest awarded to the plaintiff may only be awarded against the United States at the statutory rate of 4 percent, *Firth v. U.S.*, 554 F.2d 990, 995 (9th Cir.1977), and interest may only be awarded from the date of judgment.

15. Any finding of fact deemed properly to be a conclusion of law is to be construed as such; any conclusion of law deemed properly to be a finding of fact is to be construed as such.

## SUMMARY

Petty Officer Sean Rork, the coxswain in command of the Coast Guard motor lifeboat (MLB) that came to the aid of Glen Korpi, summed up his duty thus: "Us. Ours. Them. Theirs." [29] His duty was to his crew, then to his boat, then to those in peril on the sea, and last of all to the vessel in distress. In this case, Mr. Korpi's sailboat *Dialogue* was lost, although some of her equipment was salvaged, and Mr. Korpi himself suffered minor injuries. The MLB loud hailer took in a little too much water and some of the crew were seasick. All in all, a successful mission: no loss of life, some loss of property.

The fact is, thanks to the Coast Guard, Mr. Korpi is alive, he suffered only minor injuries, and he is very lucky they got to him as quickly as they did. He breathlessly had acknowledged this when he first replied on the radio, that he thought he could hold on for the twenty minutes it would take for them to reach him. When the MLB reached him, it appeared to the crew that the *Dialogue* was closer to the shore than reported, that its anchor was dragging and that the boat would soon be on the rocks.

There was convincing testimony that Mr. Korpi was attempting to anchor on bad holding ground: rocks and kelp, where his anchor couldn't get a grip and where his line was probably tangled in the kelp, the anchor dragging, bouncing from rock to rock along the bottom.

The coxswain and crew decided that, in light of the sea conditions, the best course was: 1) to have Mr. Korpi cut the anchor line, both to keep it from fouling the MLB's propellers, and to free up the bow cleat to attach the towline; and 2) to throw him the heaving line; and 3) to get the towline on board and attached to the *Dialogue;* and 4) to tow the boat to safety.

The best-laid plans may go astray, however. The *Dialogue* was not able to maintain her position, since her engine was not functioning.

She had only one bow cleat, which was taken up by the anchorline. Mr. Korpi finally cut the anchorline, at the MLB crew's urging, but the two boats were so far apart that the first toss of the heaving line fell short. The boats were so far apart because the *Dialogue*, engineless, could not maintain its position, and the MLB had to keep a safe distance, to avoid the anchor line's fouling its screws, or the two boats' colliding.

After the heaving line was thrown the second time, Mr. Korpi tried to pull it on board, but could not, either because he was weakened by his ordeal, or because it was more difficult to pull the line over the stanchion, or because the line was wet and therefore heavy, or because it was hung up on the tow bitt (the fitting around which the line was passed after it came off the reel) on the MLB, or a combination of all these factors.

Most of these factors are attributable to Mr. Korpi: the inability of the *Dialogue* to maintain its position, the distance between the boats, which made the line pass over more water and get more wet, his weakness, his pulling the line over the stanchion instead of under it.

Only the tow bitt was under the Coast Guard's control, and the crewmen testified that there was no problem with the tow bitt and the line was not hung up in any way.[30]

All indications are that Mr. Korpi himself made his own rescue more difficult.

Coxswain Rork was not obliged to risk his crew or his boat to save Mr. Korpi's boat or even Mr. Korpi's life. The coxswain has ultimate responsibility for his boat and his

---

**29.** Tr. November 19, 1996, p. 62:21–15–63:6.

**30.** Tr. November 19, 1996, p. 95:16–19.

crew. He heard the opinions of his crew, based on their knowledge and experience. He was entitled to make a judgment, based on the circumstances: weather, sea conditions and the conditions aboard the MLB and the *Dialogue,* and then to act on that judgment.

The Plaintiff's expert witness, Captain Bourke, also has had extensive sea experience, including two years' service in the Coast Guard, in the early 1950's. His experience is not so much in search and rescue as in the operation of large commercial vessels. The court weighed his opinions accordingly.

The court will not second-guess the judgment of Petty Officer Rork; he was there. He and his crew looked at the sea, the waves, the wind, the rocks, and the conditions aboard both boats. They added it all up and coxswain Rork made a judgment.

If he thought that the sailboat's anchor was not holding, that was his judgment.

If he thought that the clutter of line on the *Dialogue's* foredeck and the anchor line tied off to the bow cleat would interfere with properly making fast a towline, that is his judgment.

If he thought that it was necessary to release the anchor line from the bow cleat, in order to reduce the danger of the anchor line fouling the MLB's propellers, that was his judgment.

Petty Officer Rork's judgment was, that, given the sea conditions and the condition of the *Dialogue,* the safest course of action for both vessels was to have Korpi cut his anchor line, to reduce the danger of the line fouling the MLB's propellers, to pass him a towline, and to tow him to safety.

There was a slim margin of safety and a narrow window of time, because the *Dialogue* was already dangerously close to the rocks when the MLB arrived on-scene, and was moving closer, because its anchor was not holding. The first toss of the heaving line failed to reach the *Dialogue,* probably because of wind and distance. The MLB couldn't get closer than forty feet at that point because the *Dialogue* couldn't maintain position, without its engine. On the second toss, Korpi couldn't haul the towline on board

because of his own exhaustion and the line's weight, caused by its getting wet in its long passage through the water.

The Plaintiff's expert witness, Captain Bourke, testified that, if the Coast Guard had told him to cut his anchor line, he would have told the Coast Guard "to pound sand." Mr. Korpi didn't do that He cut the line. He says the MLB crew were shouting at him when he hesitated, so he went ahead and cut it, removing his "margin of safety" and worsening his situation. Captain Bourke also testified that, in his opinion, it was poor seamanship for the MLB commander to demand that Mr. Korpi cut his anchor line before the MLB crew would pass him a towline and take his boat in tow. This court has considered Captain Bourke's opinion, but he was not on scene, and did not have the benefit of observing all the circumstances at the time.

Mr. Korpi believed that the Coast Guard MLB, dispatched to assist him, instead made his situation worse by forcing him to cut the anchorline, before they would throw him the heaving line, and then not fully releasing the tow line, so that he could not get it aboard and tied off to his boat.

Korpi denies comparative negligence for not maintaining his engine, saying that the Coast Guard would not have conducted the operation differently if his boat had been a disabled motor boat. This is illogical. The owner of a motorboat which was more difficult to rescue because its engine had not been properly maintained would also have been negligent.

The fact is, his engine was disabled. The point is, that the Coast Guard would have acted differently, if his engine had NOT been disabled, by his own negligence.

This negligence directly affected his ability to assist in his own rescue. His boat's yawing and swinging at anchor required the MLB to change position constantly, in order to "station keep" and maintain a consistent position relative to his boat. Because of the unpredictability of the *Dialogue's* motion, the MLB had to maintain greater distance from it, for safety, both of the MLB and of the *Dialogue.*

Mr. Korpi overlooks his own role in this scenario: if he had had a working engine, he could have maintained his boat's position, the MLB could have maneuvered closer to him in safety, rather than staying as much as forty feet away, the heaving line could have reached him on the first toss, at a shorter distance, and he would have been more likely to get the towline aboard, with less distance for the towline to get weighed down by water and wave action.

Mr. Korpi contends that the Coast Guard worsened his situation, by ordering him to cut his anchor line, before attempting to throw him the heaving line, with the towline attached. If he hadn't cut the anchor line, the MLB might have had to leave him to his fate, and he could have been severely injured or killed, when his boat went up on the rocks.

Not even Mr. Korpi claims that he could have stayed where he was indefinitely, without consequences. He admitted he was in an impossible situation: on a lee shore, close to rocks, with no engine power.

What if the MLB had approached his boat from the stern, or attempted a "crossing the T" approach? What if the *Dialogue* had then been flung on top of the MLB by a wave, destroying both boats? What if the MLB had T-boned the *Dialogue* and sunk it, on the spot? What if he had told the Coast Guard to "pound sand," when they told him to cut his anchor line? What if the MLB had then passed the towline while the *Dialogue's* anchor line was still attached? Would Korpi have been able to get the towline aboard and then release the anchorline from the bow cleat and attach the towline in its place, all at the same time, without falling overboard or being washed over by a wave? What if the Coast Guard had left him where he was?

The court finds that Mr. Korpi deferred to the judgment of the MLB coxswain and crew, probably assuming, with good reason, that the Coast Guard personnel at Group Monterey had better knowledge of seamanship in general, and that area in particular, than he did.

In attempting to rescue Mr. Korpi, the crew of the MLB performed under trying circumstances, in an emergency situation, and at great risk to themselves.

This court finds that if the MLB crew had not attempted to take the *Dialogue* in tow, the *Dialogue* would inevitably have gone aground and been destroyed because its anchor was dragging. In the process, Mr. Korpi would likely have incurred serious injuries and might have died.

This court finds that the MLB did nothing to worsen Mr. Korpi and the *Dialogue's* condition.

This court finds that the United States was not negligent under the circumstances of this rescue.

### CONCLUSION

Plaintiff Glen Korpi has not proven that there was any liability on the part of the United States in this instance. Mr. Korpi himself is at least partially liable for the loss of his sailboat, due to his inability to effectively assist in his own rescue. Korpi has stipulated that there was no negligence on the part of the helicopter crew. For all the reasons delineated above, judgment shall be entered for defendant. Parties to bear their own costs.