## TEXAS CO. v. CITY OF NEW YORK.

(Circuit Court of Appeals, Second Circuit. April 16, 1923.)

No. 238.

1. Collision ⊜⇒90—Municipal corporations ⊜⇒747(3)—Character and necessity of speed of fireboat are elements considered on question of its negligent navigation.

While a city is not immune from liability for injury done by a fireboat, if due to its negligent navigation, the question of negligence is one of fact, and in determining it in such case the emergency of fire· and the necessity of speed are elements to be considered.

2. Collision ⊜⇒105—Evidence held insufficient to show that collision was due to negligent movement of fireboat.

Evidence *held* insufficient to establish that injury to a vessel in a slip was caused by collision with a fireboat, which entered the slip to reach a dangerous fire on the water front, or, if so caused, to show that the collision was caused by negligent handling of the fireboat.

Appeal from the District Court of the United States for the Southern District of New York.

Suit in admiralty by the Texas Company against the City of New York. Decree dismissing libel, and libelant appeals. Affirmed.

On March 12, 1917, at 6:55 p. m., the municipal fireboat New Yorker, stationed at the Battery, received an alarm as to a fire which turned out to be at Furman street, Brooklyn. The navigation of the New Yorker was in charge of Alfred C. Smith, a pilot of approximately 27 years' experience. For 9 years prior to the occurrence infra, he had continuously piloted the New Yorker. Worth, a deputy fire chief assigned to the marine division of the New York fire department, was on the New Yorker when the fire alarm was received, and he testified that it took 6 or 7 minutes to go from the Battery to pier 5, borough of Brooklyn. Fitzgerald, in charge of the land apparatus at the fire, testified that, on his way to the fire and within four blocks thereof, he saw its glare in the sky, and that, when he arrived at the scene, the fire "had full control from the bottom to the roof, four stories," of the burning building. Fitzgerald further testified that the fire was near the water front in a warehouse section, which he characterized as "one of the most dangerous we have got in the city." While the damage was slight, the fire was potentially dangerous.

Smith, the pilot, testified in respect of his movements as follows: "We were going full speed around the Battery with all the steam we could get over there with, the tide being flood, and we went up about abreast of 3 or 4, and rounded to head to the tide and came head down the river, the current being very strong in there, and making it difficult without a line, and we put a line on the end of pier 5 and on the side bitt of the New Yorker. We had a man there to assist her head gradually until she came up against the ends of the scows, which were laying two abreast about 6 or 7 feet on the inside of pier 5 in the same slip this auxiliary schooner, the Maryland, was in. When my side bitt got about abreast of the scows in that slip, the line was shifted from the dock to the outside corner of the outside barge to help break us around in the slip, so as not to have any speed on us when we came up against the Maryland, which we knew would be necessary to do to twist around in that slip."

The Maryland, belonging to libelant, was on the north side of pier 5, Brooklyn, toward the end of the pier. There were no other boats in the same slip. Her bow was in, and thus her starboard side was against the pier and her port side to the slip. Ditmar, first assistant engineer of the Maryland, was in his cabin in the deckhouse aft of amidships. He testified that he felt a jar

about 7:15 p. m., then rushed out on deck on the port side and saw the New Yorker alongside, or approximately alongside. At that time, according to Ditmar, the bow of the New Yorker was about 10 feet away from the side of the Maryland. Ditmar also testified that the space of clear water in the slip between the port side of the Maryland and the neighboring pier was about 75 to 100 feet. He said that there was no bulges nor dents in the Maryland throughout the day, but that after this occurrence "a plate was dented, bulged in; inboard."

Jackson, a technical engineer of the Texas Company, testified that he inspected the Maryland after receiving a report of the alleged collision, that he found that the plate just at about the break of the house had a dent in it a couple of inches deep, and that this dent was approximately 3 feet above the surface of the water. He was asked whether he had any occasion to inspect the Maryland before March 12, 1917, and answered, "I inspected her after she first came in and anchored down the Bay, before she went up to the loading berth." There is, however, no testimony by Jackson as to inspection at pier 5 prior to the date of the alleged collision.

The New Yorker had rope fenders. Deputy Fire Chief Worth testified, "As we straightened up a little bit, the fenders on our stem engaged the Maryland; not direct, but in a slanting way." He and Smith both stated that they felt no jar whatever.

Bigham, Englar & Jones, of New York City (Leonard J. Matteson and Andrew J. McElhinney, both of New York City, of counsel), for appellant.

George P. Nicholson, of New York City (Charles J. Carroll, of Brooklyn, N. Y., and John T. Condon, of New York City, of counsel), for respondent-appellee.

Before ROGERS, HOUGH, and MAYER, Circuit Judges.

MAYER, Circuit Judge (after stating the facts as above). [1, 2] We agree with the District Court in concluding that any such contact as that testified to by Worth could hardly have caused the damage complained of. Those familiar with fenders of the kind referred to will at once appreciate that, if the maneuver was as described by Smith and the contact as described by Worth, it would be indeed strange if the dent was made by the New Yorker as a result of the contact of the fenders "in a slanting way." There was no testimony as to a direct impact nor any other collision of a kind likely to cause the damage. In view of the strong current, the movement described by Smith was concededly properly planned, but the complaint is that his execution was faulty.

Counsel for appellant state that their concern is not so much the comparatively small damage to the Maryland as the erroneous principle which they contend was laid down by the District Judge in respect of holding a fireboat to a. lesser degree of responsibility than would be placed upon some other craft not charged with the official duty of hastening to the fire and they cite Workman v. City of New York, 179 U. S. 552, 21 Sup. Ct. 212, 45 L. Ed. 314, and other cases in support of this contention. The question in the Workman Case was whether or not the municipality was immune from liability for injury done by a fireboat. The Supreme Court held that it was liable, if guilty of negligence. What is negligence is usually a question of fact to be determined by the duties involved and the surrounding facts and

circumstances. It is the duty of a fireboat to proceed as promptly and as speedily as possible to such part of the water front as the situation may require. Speed is, of course, vital, and particularly so in the waters along the New York City water front, where there are many slips, docks, piers, sheds, warehouses, and the like. Along this water front are frequently cargoes and contents of a highly combustible character, and it is a matter of common knowledge that some of the fires, most destructive both of life and property, have occurred along the water front. In these circumstances a fireboat cannot, of course, be reckless and regardless of prudent methods of approach and navigation, but the emergency of fire and the consequent necessity of speed are elements to be considered. As said in the Workman Case: .

"But, while it is true that *the emergency of fire was an element to be considered in determining whether or not those in charge of the fireboat were negligent on the occasion in question, since negligence is relative*—that is, depends upon whether there was an absence of the care which it was the duty to exercise *under the particular circumstances*—it does not follow that the emergency of fire exempted from the exercise of such due care as the occasion required towards property which was in the path of the fireboat as it approached the slip for the purpose of getting into a position where it might assist in extinguishing the fire in question."

It may happen, therefore, that contact with another craft which would not be excusable under ordinary circumstances may be excusable in the case of a fireboat, in the light of the maneuver, its execution, and the speed required because of the fire danger. It is never possible to lay down a rule of accuracy or definiteness when dealing with negligence. Whether there is negligence is a question of fact, determined in each case, of course, in the light of the applicable principles of law. A fireboat, in some circumstances, might be guilty of negligence, and in other circumstances might be without fault. The test must be found in the facts and circumstances of the particular case under consideration. In the case at bar, the maneuver was right, and if, for the purpose of argument, it be assumed that the impact was somewhat more severe than the testimony discloses, nevertheless we think that, in view among other things, of the necessity of haste cast upon the pilot in his duty of bringing the fireboat speedily to its destination, there was no negligence.

Decree affirmed.