**Julianne WOODYER, a Canadian citizen, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. C02–5192FDB.**

United States District Court, W.D. Washington, at Tacoma.

March 17, 2004.

Shane Cornelius Carew, Carew Law Office, Seattle, WA, for Julianne Woodyer, Plaintiff.

C N Coby Cohen, Perkins Coie, Seattle, WA, for Frederick William Moss, Interested Party.

Jeanne M Franken, Torts Branch, Civil Division, San Francisco, CA, Philip H Lynch, U.S. Attorney's Office, Tacoma, Warren A Schneider, U S Department of Justice, Torts Branch, Civil Division, San Francisco, CA, for United States of America, Defendant.

### FINDINGS OF FACT and CONCLUSIONS OF LAW

BURGESS, District Judge.

This case having come on for a trial without a jury, and the Court having heard and reviewed the testimony of the witnesses, live and by deposition, and having duly considered the evidence of record, the credibility of the witnesses, and the contentions and arguments of counsel, the Court herewith makes its findings of fact and conclusions of law, in accordance with Rule 52(a) of the Federal Rules of Civil Procedure, as follows:

## FINDINGS OF FACT

1. This is an action within the admiralty and maritime jurisdiction of this Court against the United States of America.

2. On April 17, 2000, plaintiff Julianne Woodyer, a Canadian citizen, was onboard the motor boat TIGER which was being operated by its owner, William Frederick Moss, her friend and colleague in the self-proclaimed "World Whale Police". Their stated purpose was to document and protest a federally-protected Makah whale hunt reportedly about to begin off the northern coast of Washington State south of Neah Bay.

3. A whaling canoe manned by members of the Makah tribe was hunting for the first time that season within the Regulated Navigation Area (RNA) which had been established by the United States Coast Guard pursuant to federal regulation for the purpose of protecting life and property at sea during such operations that year.

4. A Moving Exclusionary Zone (MEZ) had also been established by federal regulation within the RNA to provide a further circle of protection of 500 yards around any Makah canoe while actively engaged in whale hunting.

5. The intent of the Makah to conduct whaling activities and the existence of both the RNA and the MEZ had been broadly disseminated in advance by various means, including public meetings, extensive media coverage, and, significantly, Notices to Mariners.

6. The need for the zone was partially based on the known presence of at least one high-powered rifle on the Makah support boat which was to be used in killing a whale once one was harpooned.

7. The Makah hunters were using a traditional light wooden canoe with only a 6 inch freeboard and no bailing equipment. The hunting canoe could be easily swamped, and its crew potentially placed in jeopardy since they were also dressed traditionally for the hunt, without protective clothing or personal flotation devices (PFDs), and operating in an open ocean environment.

8. The hunting canoe had a harpoon on board; its paddles, which were about six feet long, were sharply pointed in the historic manner; and its support boat carried the aforesaid rifle. The Coast Guard did not know whether other weapons were also being carried on either the Makah vessels or the protest craft.

9. The United States Coast Guard had a presence on scene that day, and had positioned its vessels (a Cutter with the Surface Operations Officer from Group Port Angeles on board, a 41–foot Utility Boat with Station Neah Bay's Commanding Officer on board, and two smaller boats called "Safeboats") in the general vicinity of the hunt to warn the boating public when possible that it was being conducted (via handouts, voice, "loud hailer", or radio communications, as appropriate). They were to avoid interfering with the hunt.

10. Given the remote location of the hunting grounds, the Coast Guard was also present to provide an expedited response in the event of confrontations between whalers and protesters, something which had taken place in prior years, out of concern that this could lead to the necessity of initiating rescue operations.

11. Also on scene that day were the Makah's own support vessel; a NOAA observer boat, the RESEARCH 2; and, at times, Coast Guard helicopters.

12. On the morning of these incidents, the Makah hunting canoe was flying a whaling pennant from its stern and the tribe had made local broadcasts to announce the hunt and establish the exis-

tence of the MEZ as required by regulation. To the north of the actual hunting canoe, another Makah canoe was being towed by a fishing vessel at times. It appeared to be practicing. This second canoe was not flying the whaling pennant, no broadcasts had been made regarding it, and it was obviously not actively engaged in whaling operations that day, something Mr. Moss has admitted he fully understood. At times that morning the USCG Cutter OSPREY was coincidentally positioned in the general vicinity of that second, non-hunting canoe, to the north of the actual whaling, in order to caution well in advance any boaters who might be headed through the area going south from Makah Bay that the RNA and the MEZ were in effect off the Washington coast. Although there were comments in one log and by one of the officers after the fact that TIGER may have been "decoyed" for a while by the presence of the Cutter near the second canoe, there was no plan by the Coast Guard to "decoy" the protestors by stationing the Cutter purposefully near the second canoe. In any event, the presence of the Cutter north of the actual hunting area was irrelevant to the incidents that later occurred to the south.

13. TIGER spent several hours cruising in the vicinity of the practice canoe and the Cutter OSPREY that morning. During that time repeated warnings were given over the radio by OSPREY to Ms. Woodyer and Mr. Moss on TIGER to the effect that a Federally defined Regulated Navigation Area (RNA) had been established off the coast, and that within it a Moving Exclusionary Zone (MEZ) existed surrounding any canoe actively engaged in whaling. Ms. Woodyer and Mr. Moss responded to these warnings by arguing with the officers about the existence of the zone and its lawfulness, and the appropriateness of the hunt and its lawfulness, and refused to accept a copy of the regulations or a chart showing the extent of the RNA. Ms.

Woodyer's videotape of these events clearly shows that she was an active participant in communications with the Coast Guard; indeed, she fed Mr. Moss many of the argumentative statements he then passed over the radio back to the Coast Guard.

14. TIGER was also told by OSPREY-in clear and unambiguous terms that morning that it would be "taken off the water" if it violated the MEZ, and that it should stay well clear of any hunting activity. At one point Mr. Moss responded to these warnings with a comment that the Makah were not whaling right now, which was true as to the second canoe near him at the time; and OSPREY responded with "Roger that," meaning only that "I received your message", and a warning to stay away anyway.

15. Despite these warnings, several hours later, at roughly 10:00 a.m. that morning, TIGER took off from the OSPREY's position and headed south at a high speed towards a location where Moss and Woodyer had spotted a helicopter and suspected whaling activity. Mr. Moss also testified that it had always been their intention on TIGER, as in years past, to survey the entire coast for whaling activity. The NOAA observers, on a vessel with a similar profile to TIGER, testified they saw TIGER off in the distance heading at high speed directly at the site of the actual whaling.

16. As TIGER rapidly approached the site of the actual hunt, the two smaller Coast Guard vessels on scene, referred to as Safeboats, were directed by the 41–foot Coast Guard Utility Boat, which was in charge on scene, to intercept TIGER, stop it, and conduct a boarding. The Commanding Officer from Station Neah Bay, CWO Coster, who had met Mr. Moss in the past, testified that he had concerns about Mr. Moss' stability and wanted to give him time to cool down. The Safeboats pro-

ceeded to intercept TIGER, yelling and waving at it, but were ignored. Finally, as TIGER broke the MEZ on a rapidly closing collision course with the canoe, one of the Coast Guard Safeboats, fearing that TIGER would ram the canoe, performed three or four "S-turns" directly in front of TIGER's bow to try to get it to stop, but again this was to no avail. TIGER continued its full speed assault on the canoe, which was at that moment actually engaged in stalking a whale. The video shot by Ms. Woodyer clearly shows that both persons on TIGER were fully aware the Coast Guard was in pursuit and wanted TIGER to halt.

17. For the Coast Guard, the safety of the hunting party, the protestors, all Coast Guard members, and other Federal and State personnel on scene were of concern in this quickly changing and rapidly developing situation, as was the safety of any members of the boating public in the vicinity who might enter the area unawares.

18. When the TIGER refused to stand down for law enforcement and continued to encroach on the hunt within the MEZ, the nearest Coast Guard Safeboat, the one operated by BM1 Doris, was forced to attempt to avert a disaster by momentarily impacting TIGER in an effort to get it to stop; this action was clearly taken in an authorized "defense of others." The collision occurred well within the MEZ according to Mr. Coster who was watching the events on the 41–footer's radar, and the NOAA witnesses on RESEARCH 2; a fact further established by the various video records of the incidents. The distance of the first impact from the canoe was variously estimated as between 250–400 yards, as also established by a frame isolated from one of the helicopter videos.

19. Mr. Doris' efforts were successful momentarily. However, instead of ending their dangerous activity, Ms. Woodyer yelled: "You're going f..king down" to the Coast Guard, and Mr. Moss joined in with "F..k you...", and started TIGER up again at high speed to evade law enforcement and drive again towards the canoe. The Safeboat which hit TIGER tried to pursue it but could not catch it; the other Safeboat was dead in the water since it had lost its lower unit trying to avoid also colliding with TIGER.

20. TIGER next made a hard turn to port to get around the NOAA observer vessel and place itself on another collision course with the exposed canoe. In the process TIGER cut directly across the bow of the approaching 41–foot Coast Guard vessel. Its operator, BM1 Walsinger, thought he had been outrun but was fortunately just able to catch up to TIGER by "catching its wake". He positioned his boat on a course intended to put it between TIGER and the whaling canoe with the intention of herding TIGER away from the cluster of boats that were in the zone of danger being created by TIGER. Nevertheless, TIGER still did not stop, slow, or change course away from the canoe, and eventually collided with the 41–footer, this collision taking place even closer to the canoe than the first one, perhaps 100–200 yards away, and again well within the MEZ, as is evident from the videos and another still frame isolated from one of the helicopter videos. This second collision has been characterized by the Coast Guard as a "shouldering" maneuver.

21. Even after the second collision, TIGER began to start up once again but finally stopped, Mr. Moss surrendered, and he and Ms. Woodyer ended their dangerous activities.

22. Mr. Moss was handcuffed and arrested. Ms. Woodyer was, at first, handcuffed but began complaining of back pain so she was seen by a Coast Guardsman who was a trained EMT, MK1 Short, and the handcuffs were removed. She was not

arrested. Handcuffing is a standard protective operating procedure in these circumstances. The boarding team was armed and concerned with the possibility of "gun grab" as well as the potential presence of weapons of some sort on board TIGER.

23. Although offered, Ms. Woodyer refused helicopter medivac and was returned to shore on a Coast Guard boat. There, she again refused transportation to a hospital for medical care, and signed a release to that effect. Sometime later she accompanied Mr. Moss to retrieve TIGER from the Coast Guard and walked down a floating dock, even boarding TIGER, all without apparent difficulty, as is evident from a video taken at the time. She remained in Neah Bay for about six more weeks to continue to participate in anti-whaling activities.

24. Petty Officers Wallsinger and Doris were both experienced and capable Coast Guard Coxswains, fully qualified to command their respective vessels. Their efforts to stop TIGER using the minimal force necessary while still protecting the lives of the people on board the canoe, and the surrounding vessels, were appropriate, measured, and necessary actions under the circumstances.

25. At all times Mr. Moss had the opportunity and ability to turn, slow or stop his vessel. He was an experienced boater who had previously been boarded by the Coast Guard; he understood it had a legal right to stop and board his vessel; yet he failed to stop when the Coast Guard indicated to him that he should do so, in clear and unambiguous terms. Indeed, he admitted he had been boarded at another time by a Coast Guard vessel that activated its blue light and yelled to him to stop, as occurred here.

26. Mr. Moss also admitted on the stand both that he has suffered from untreated manic depression for twenty-five years and that he had talked about "throwing boats at the hunt" even before it began in 2000. He pled guilty to the Federal charge of obstructing a law enforcement officer due to his activities on April 17, 2000. In his plea agreement he conceded that he was approaching the area of the hunt when the Coast Guard used its loudhailer, marine radio, and flashing blue lights to tell him to stop, slow, or turn, but he did not comply and thus hindered and delayed the officers in the performance of their lawful duties. His attempted repudiation of that plea during the trial in this case is without merit.

27. Ms. Woodyer admits she spent the time between the two collisions hiding the videotape in her pants, in the hope it would not be discovered when they were eventually apprehended. She also concedes that for most of the day she was busy videotaping, and thus, at those times, saw events on the water only through the narrow focus of a viewfinder. She was not keeping a proper lookout around TIGER for other vessels and their location, something her own expert conceded is required while boating.

28. At no time that day did Ms. Woodyer, who was acting in conjunction with Mr. Moss, make any effort to stop TIGER or get it to turn away from the canoe. Instead, she was working with him to proceed against the canoe. Indeed, she was yelling obscenities at the Coast Guard officers after the first incident, clearly indicating her defiance and dedication to disruption of the hunt.

29. Ms. Woodyer's active involvement in this venture is evident. She carried business cards identifying her as "Canadian operations" for Mr. Moss' organization, the World Whale Police, and he considered her its videographer. He provided her with a cabin free of charge, which they shared, during her stay in Neah Bay for

the protests in 2000. It should also be noted that she had taken a leave of absence from her job with the animal rights' organization Zoo Check Canada to be able to actively participate in the whaling protests, something she had also done in a previous year when she first met Mr. Moss. Although the exact nature of their personal relationship remains unclear, their purpose on the water that day was unitary: to protest the hunt in a way that would, at the very least, interfere with it, or as she stated in communications with her therapist later, to get between the whales and the canoe "to keep the whales safe."

30. Ms. Woodyer, and her "World Whale Police" colleague, Mr. Moss, acted with complete disregard for the safety of the people in the canoe, those in its immediate vicinity, including themselves, and the Coast Guard, at the time of these collisions. They failed to stop when hailed by law enforcement; they failed to stop despite having a Coast Guard boat making repeated passes in front of them at close quarters; and even started up again heading directly at the canoe at high speed after the impact with the first Coast Guard boat. In the process, in addition to their hindering and endangering law enforcement officers and the people those officers were attempting to protect that day, Ms. Woodyer and Mr. Moss violated the navigation rules of the road, safe operating practices, good seamanship, Federal regulations, and common sense.

31. Their joint intentional acts and negligence were the sole proximate cause of this collision and, consequently, of any injury Ms. Woodyer alleges she sustained thereby. The opinions expressed by her alleged maritime law enforcement expert, whose experience in the field is not current, were not credible. He opined that the Coast Guard should have made one more attempt to hail TIGER on Channel 10, which was not even the accepted hailing frequency, and that the Coast Guard should have waited until TIGER had closed within 100 yards of the canoe before intervening physically to protect it. Of course, based on their actual deeds, it is complete speculation that TIGER's crew would have responded to yet another warning when they had already defied all others that morning. And to propose a 100 yard MEZ, a conclusion by a person not on scene, would be to rewrite the regulation that existed. Moreover, as CWO Coster testified, at that close range it would only have been luck for the Coast Guard to have been able to defend the canoe because the vessels were moving too fast. Also, positioning Coast Guard vessels so close to the canoe would have disrupted the hunt, and placed Coast Guard personnel, as well as TIGER, in close range of the rifle used to dispatch a whale.

32. For its part, the United States Coast Guard was involved in a legitimate law enforcement activity, acted with appropriate restraint given the circumstances in an effort to preserve all life at sea, used the minimum amount of force necessary to protect the lives of all people on the water that day, and to find otherwise would effectively be to second guess the split second boat-handling decisions of experienced and highly trained Coast Guard Coxswains who were on scene and faced with the need to act.

33. The Operations' Order and the Law Enforcement Matrix were intended only as guidelines for the use of the Coast Guard officers in the field, and were followed in this case in any event. The Order clearly states that an attempted ramming by a protest vessel presents a "defense of others" situation, and that elevates the allowed force to the highest levels.

34. As to another claim of plaintiff, there is no evidence of purposeful destruc-

tion of relevant evidence in this case by the Coast Guard.

35. Because plaintiff has failed to carry her burden of proof regarding liability and damages, judgment will be entered for the United States.

## CONCLUSIONS OF LAW

1. This case is brought by a crew member participant on a privately owned and operated boat against the United States of America alleging negligence on the part of the United States Coast Guard presents an admiralty and maritime matter within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and, as it sounds in admiralty, jurisdiction against the sovereign exists solely pursuant to the Public Vessels Act (PVA), 46 U.S.C.App. §§ 781–790, which incorporates by reference the consistent provisions of the Suits in Admiralty Act (SIAA), 46 U.S.C.App. §§ 741–752. The case does not arise under the Federal Tort Claims Act (FTCA). 28 U.S.C. § 2680(d).

2. The PVA provides a limited waiver of the United States' sovereign immunity from suit for certain maritime claims. Under the statute an injured party has no greater claim against the United States than she would have against a private person under similar circumstances. 46 U.S.C.App. § 742, 743; *Canadian Aviator v. United States*, 324 U.S. 215, 65 S.Ct. 639, 89 L.Ed. 901 (1945).

3. One of the limitations on the waiver of sovereign immunity is that the United States cannot be sued for acts which are discretionary in nature. Known as the discretionary function exception, this limit on the sovereign's waiver of immunity has been said to exist in order to prevent judicial second-guessing of administrative decisions through the medium of a tort action. *Lesoeur v. United States*, 21 F.3d 965, 968 (9th Cir.1994), citing *Kennewick Irrigation District v. United States*, 880 F.2d 1018, 1021–22 (9th Cir.1989); *United States v. Varig Airlines*, 467 U.S. 797, 814, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984). Insofar as plaintiff's claims are based on such discretionary actions, or inactions, they must be denied because this Court is without jurisdiction over them.

4. The discretionary function doctrine, while specifically enunciated in the Federal Tort Claims Act, is equally applicable to claims brought pursuant to the admiralty waivers of the sovereign's immunity, *i.e.* those under the Public Vessels Act and the Suits in Admiralty Act. *Earles v. United States*, 935 F.2d 1028, 1032 (9th Cir.1991); *Baldassaro v. United States*, 64 F.3d 206 (5th Cir.1995), *cert. denied*, 517 U.S. 1207, 116 S.Ct. 1823, 134 L.Ed.2d 929 (1996); *United States Fire Ins. Co. v. United States*, 806 F.2d 1529 (11th Cir. 1986).

5. The Supreme Court has made it clear that discretionary conduct is not confined to decisions made at the policy or planning level, as long as an act involves an element of judgment or choice and is based upon considerations that are susceptible to public policy considerations, such as economic, social and political considerations. *U.S. v. Gaubert*, 499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991). Moreover, a conscious policy decision need not have been made. *Lesoeur v. United States*, supra; *Baum v. United States*, 986 F.2d 716, 720 (4th Cir.1993); *C.R.S. v. United States*, 11 F.3d 791 (8th Cir.1993); *Sea–Land Service, Inc. v. United States*, 919 F.2d 888, 892 (3d. Cir.1990), *cert. denied*, 500 U.S. 941, 111 S.Ct. 2235, 114 L.Ed.2d 477(1991); *Myslakowski v. United States*, 806 F.2d 94, 97 (6th Cir.1986), *cert. denied*, 480 U.S. 948, 107 S.Ct. 1608, 94 L.Ed.2d 793 (1987) ("[E]ven the negligent failure of a discretionary government policymaker to consider all relevant aspects of a subject matter under consider-

ation does not vitiate the discretionary character of the decision that is made.").

6. Decisions regarding Coast Guard methods of law enforcement and training, which necessarily involve the allocation of limited financial and personnel resources and hence discretionary decisions, as well as how much information to disclose to protestors and where to position law enforcement vessels during an operation, all clearly fall within the discretionary function exception to the waiver of the sovereign's immunity, and the Court lacks subject matter jurisdiction over this suit to the extent such decisions are implicated.

7. Moreover, as stated in *United States v. Faneca*, 332 F.2d 872, 875 (5th Cir.1964), *cert. denied*, 380 U.S. 971, 85 S.Ct. 1327, 14 L.Ed.2d 268 (1965), "It is clear that the United States has a *duty* to maintain law and order and to enforce the commands of its courts; just how best to fulfill this duty is wholly within the *discretion* of its officers." (emphasis in original)

8. The tort of negligence in a maritime case is comprised of the traditional prima facie elements of (1) duty, (2) breach of duty, (3) causation, and (4) damages. The burden of proving negligence rests entirely and absolutely on plaintiff. See, e.g., *Ramos v. Matson Navigation Company*, 316 F.2d 128 (9th Cir.1963); *Lieberman v. Matson Navigation Co.*, 300 F.2d 661 (9th Cir.1962); *Fueston v. Lykes Brothers S.S. Co.*, 550 F.Supp. 139 (N.D.Cal.1982), *aff'd*, 714 F.2d 152 (9th Cir.1983); *Thomas v. Diamond M. Drilling Co.*, 569 F.2d 926 (5th Cir.1978).

9. It is improper for plaintiff's expert to substitute a retrospective judgment for that of the Coast Guard boat operators who were forced to make split second decisions on scene in a changing maritime environment. Much like a rescue attempt, the actions of the Coast Guard and especially of these Coxswains should be considered in the light of the circumstances that faced them when they acted, and not with the "wisdom" of an "armchaired admiral" gained after the fact, especially after hours of video review—much of it stop motion, that was clearly not available to the responders. See, *Afran Transport Company v. S/S Transcolorado*, 458 F.2d 164 (5th Cir.1972), *reh. denied* 468 F.2d 772 (5th Cir.1972); *Korpi v. United States*, 961 F.Supp. 1335 (N.D.Cal.1997), *aff'd* 145 F.3d 1338, 1998 WL 231207 (1998).

10. In applying these standards, Courts will generally refrain from second guessing the decisions made by rescue personnel in the midst of a rescue attempt, and should similarly refrain from second guessing decisions made during law enforcement prevention activities for the same reasons. See, e.g., *Johnson v. United States*, 378 F.2d 732 (9th Cir.1967)(citing *Texas Co. v. City of New York*, 290 F. 382 (2nd Cir.1923)). The consequences of hesitation in the circumstances presented could have been disastrous.

11. The doctrine of spoliation has no application to anything which occurred in this case. There is no showing that relevant evidence is missing, lost or destroyed.

12. TIGER's intentions could not be known except by its actions, which presented a serious and immediate threat to the people on the hunting canoe, as well as the boats surrounding it, in an open ocean environment. The Coast Guard had little option but to try to intervene to prevent a tragedy of potentially great magnitude had the canoe been rammed or swamped, or if the canoe had—in self defense—taken action to protect its occupants from the threat being posed by TIGER. The Government's actions did not cause the collisions, and were not negligent, and the use of force by the Coast Guard was appropriate in defense of the canoe and the vessels surrounding it from the ramming or swamping threat posed by TIGER.

13. Mr. Moss violated navigation rules and regulations, and is thus presumptively at fault in this case. He turned directly in front of the 41–footer, headed his craft at high speed into a congested area, violated the MEZ established by federal regulation and threatened the crews of the canoe, the surrounding vessels and the Coast Guard vessels in the process. To overcome the presumption it would have to be shown that his fault not only was not but could not have been the cause of the collision, under the rule articulated in *The Pennsylvania*, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1873). See, *Trinidad Corp. v. S.S. Keiyoh Maru*, 845 F.2d 818 (9th Cir.1988). This cannot be done since at any moment throughout these events he could simply have stopped the TIGER, or turned it away from the whaling canoe and headed out to sea. He always had the opportunity to do the right thing and stand down.

■ 14. Additionally, the acts of Mr. Moss in operating TIGER, whether intentional or negligent, are imputable to Ms. Woodyer, his joint "adventurer". See, e.g., *United States v. Ventura–Melendez*, 321 F.3d 230, 234 (1st Cir.2003)(passenger in protest vessel which violated maritime security zone deemed to have shown sufficient purpose in the venture for his criminal conviction to be upheld because he never expressed a desire to exit the boat, turn it around or leave the zone). Ms. Woodyer was an active participant in all phases of the day's events and did nothing to repudiate Mr. Moss' operation of TIGER. Thus, for this reason too, she is precluded from recovering against the United States.

15. A plaintiff such as Ms. Woodyer is herself also negligent if she fails to exercise reasonable care under the circumstances, and this is recognized as a valid defense in maritime law. *Socony–Vacuum Oil Co. v. Smith*, 305 U.S. 424, 59 S.Ct. 262, 83 L.Ed. 265 (1939); *Kopczynski v. The Jacqueline*, 742 F.2d 555 (9th Cir. 1984), *cert. denied*, 471 U.S. 1136, 105 S.Ct. 2677, 86 L.Ed.2d 696 (1985); *DuBose v. Matson Nav. Co.*, 403 F.2d 875 (9th Cir. 1968); *American President Lines, Ltd. v. Welch*, 377 F.2d 501 (9th Cir.1967); *Manning v. Gordon*, 853 F.Supp. 1187 (N.D.Cal.1994).

16. The standard to be used in determining a plaintiff's conduct is that of a reasonably prudent person under similar circumstances. *Prosser and Keeton on Torts*, § 65, pp. 453–54 (W. Keeton ed. 5th ed.1984); *Mroz v. Dravo Corporation*, 429 F.2d 1156, 1163 (3d Cir.1970); *Almaraz v. Universal Marine Corp.*, 472 F.2d 123, 124 (9th Cir.1972).

■ 17. Comparative negligence may even be established by a plaintiff's own testimony. *Mroz v. Dravo Corp.*, supra.

18. In addition to those acts imputed to her as Mr. Moss' compatriot, Ms. Woodyer herself failed to maintain a lookout and, to the extent she now contends she was merely a peaceful protestor who would have stopped if only she had realized the Coast Guard wanted her boat to stop—a contention for which there is negligible support—then her failure to keep a proper lookout again places sole responsibility for the outcome on her.

Any Findings of Fact which constitute Conclusions of Law and Conclusions of Law which constitute Findings of Fact shall be deemed to have been determined accordingly.

NOW, THEREFORE, IT IS ORDERED: the Clerk of the Court is directed to enter Judgment against the Plaintiff and for the United States of America and to DISMISS this cause of action with prejudice.